MANUFACTURERS RAILWAY COMPANY AND ST. LOUIS SOUTHWESTERN RAILWAY COMPANY v. UNITED STATES AND INTERSTATE COMMERCE COMMISSION.

MANUFACTURERS RAILWAY COMPANY AND ANHEUSER-BUSCH BREWING ASSOCIATION ET AL. v. UNITED STATES AND INTERSTATE COMMERCE COMMISSION.

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MISSOURI.

Nos. 24, 25. Argued March 21, 22, 1917.—Decided April 15, 1918.

In a proceeding before the Interstate Commerce Commission to establish through routes and joint rates over the Manufacturers Railway— a company operating terminals at St. Louis and held by the Commission to be a common carrier, though controlled and principally used by the intervening Brewery,—and certain trunk lines at St. Louis, the contention was that the latter, in canceling tariffs wherein they had applied their St. Louis rates to industries on the Railway and had absorbed its switching charges, and in continuing this practice as to another terminal—St. Louis Terminal Railroad Association—whose shares they owned, were guilty of unlawful discrimination, in avoidance of which the absorptions should be reëstablished.

Held : (1) That the finding of the Commission, based upon differences of location, ownership and operation, that there was not undue discrimination was not without evidentiary support and not an abuse of discretion.

(2) That the Commission was justified by the evidence in holding that not more than $2.50 per car should be added to the trunk line rates for the Railway terminal, upon the ground that such limitation was necessary to avoid undue preferences or indirect rebates to the Brewery.

(3) That, as the controversy was not directed to the reasonableness of the trunk line rates, the Commission, in fixing the maximum joint

rate, properly assumed them to be reasonable *per se;* the "increased rate clause" of the Commerce Act, as amended (c. 309, 36 Stat. 552), does not lay upon the carrier the burden of proving a new rate reasonable when that question is not involved in the hearing.

(4) That the decision of this court, respecting the St. Louis Terminal Association (224 U. S. 383, 412; 236 U. S. 194, 207–209), left untouched the powers of the Commission, and complainants were entitled at most to have the Commission consider the nature and objects of the Association as circumstances bearing upon the question of discrimination and questions pertinent thereto.

In fixing joint rates it is within the discretion of the Commission to allow the carriers to arrange the divisions, as contemplated by the first paragraph of § 15 of the Commerce Act (36 Stat. 551), subject to review by the Commission.

Whether a discrimination is undue or unreasonable or unjust is a question of fact confided by the Commerce Act, as amended (§§ 15, 16), to the judgment and discretion of the Commission, and upon which its decisions, made the basis of administrative orders operating *in futuro,* are not to be disturbed by the courts except upon a showing that they are unsupported by evidence, were made without a hearing, exceed constitutional limits, or for some other reason amount to an abuse of power.

A court cannot substitute its judgment for that of the Commission upon a purely administrative matter.

Common use of the facilities of the St. Louis Terminal by fourteen trunk lines owning its capital stock, under a single arrangement by which they absorbed the terminal charges, *held* not as a matter of law to entitle another terminal company, having no trunk line and doing terminal switching alone, to precisely the same treatment.

The District Court has no jurisdiction under the Commerce Acts to exercise administrative authority where the Commission has failed or refused to exercise it, or to annul orders of the Commission not amounting to an affirmative exercise of its powers. So *held* where the Commission fixed maximum joint rates for trunk lines and a terminal company, and the gravamen of the latter's suit was the failure to fix the divisions.

A proper foundation for reparation was not laid in the evidence submitted to the Commission in this case.

Pending a proceeding before the Commission involving an inquiry as to how much could properly be allowed to a terminal as divisions or absorptions by trunk line carriers, one of the latter, which was

and remained a party, filed and published a tariff providing for absorptions of the terminal's switching charges up to a certain rate per car which it had previously allowed and retracted and was in the position of attacking in the proceeding as illegal and excessive. The Commission suspended the proposed absorption for 120 days from the effective date, and then for 6 months, to await its decision in the pending inquiry, treating the one as ancillary to the other and as involving no different question on the merits, and, upon deciding the original matter within the 6 months, canceled the tariff without having given it a separate hearing. *Held*, proper, and not inconsistent with the provisions of § 15, second paragraph, of the Commerce Act, as amended June 18, 1910, c. 309, 36 Stat. 552, respecting suspensions of new rates.

Although a rate-fixing order is not conclusive against attack upon the constitutional ground of confiscation, correct practice requires that the objection be made, and all evidence pertinent thereto adduced, before the Commission in the first instance if practicable.

Where the Commission, after full hearing, sets aside a rate as unreasonably high, only a clear case would justify a court, upon evidence newly adduced but not newly discovered, in annulling the Commission's action upon the ground that the same rate was so unreasonably low as to deprive the carrier of its constitutional right of compensation.

The evidence produced and relied on in the District Court by the complaining terminal,—consisting of expert valuation of its leasehold and other property, calculations of revenue and expenses, with allocations to its interstate business,—examined and *held* largely speculative, inconsistent with other evidence, in part based on erroneous theories, and, as a whole, insufficient to establish that a rate of $4.50 per car for interchange movements would be confiscatory.

The voluntary adoption of a rate by a carrier is some evidence against the carrier that it is remunerative.

In estimating the value of a leasehold to the lessee, taxes paid by the lessor should not be deducted from the annual cost as measured by the gross rental.

A finding by the Commission that a railway is a common carrier does not mean that all of its property must be treated as employed in the public service; portions used as a private plant facility should not be considered in determining the adequacy of a rate.

A city leased for railway purposes land, which in considerable part constituted a public wharf. *Held*, that, if the rental was less than

the fair annual value, it must be presumed one excess was granted to the public, and not to the private interest of the carrier, in capitalizing its assets for the purpose of testing the adequacy of a rate.

In testing the adequacy or an interstate rate, it is error to base the computation on the receipts and expenses of the carrier's entire business without considering the adequacy of its charge for services not affected by the rate or their possibly private character.

Affirmed.

These are appeals from final decrees made by the District Court in two cases dismissing petitions filed by the appellants for the purpose of enjoining the enforcement of orders made by the Interstate Commerce Commission. The cases are closely related to each other, were argued at the same time, and will be disposed of in a single opinion.

The facts are intricate, and have been the subject of consideration by the Commission in three reports (21 I. C. C. 304; 28 I. C. C. 93; 32 I. C. C. 100), from which the following resumé is taken:.

Situate in South St. Louis, within the limits of the City of St. Louis, Missouri, and on the high ground back from the Mississippi River, are the great industrial plants of the Anheuser-Busch Brewing Association, a corporation, hereinafter called the Brewery, which occupy approximately 126 acres—35 or 40 city blocks—intersected by streets. There are numerous structures, in which are conducted the manufacture and marketing of beer and related products. The tonnage shipped by and to the Brewery is very heavy, amounting to upwards of 40,000 carloads per annum, or approximately one-thirtieth of all the inbound and outbound traffic of the entire city. For a number of years following the establishment of the Brewery its inbound raw materials and outbound products were drawn by horse and wagon from and to the tracks of the St. Louis, Iron Mountain & Southern Railway Company, hereinafter called the Iron Mountain,

on the river front. In the year 1885 this method was abandoned and a plant railway operated by steam was substituted. Two years later the plaintiff Manufacturers Railway Company was incorporated, hereinafter referred to as the Railway, to which control and operation of the plant system was made over. The Railway now has a main line of $2\frac{1}{4}$ miles, and approximately 23 miles of side tracks. It is engaged exclusively in the switching and delivery of carload freight within the City of St. Louis. The traffic of the Brewery constitutes about 75 per cent. of its total tonnage. At the time of the hearing before the Commission, it owned no cars and only four locomotives; the cars used for the transportation of shipments originating on its line being furnished principally by the St. Louis Refrigerator Car Company, a substantial portion of whose stock is owned by the holders of a majority of the stock of the Brewery. The facilities of the Railway, however, for a considerable period and to a large extent had been available to the public, and it was held by the Commission to be a common carrier, and not a mere industrial or tap line. But a majority of the stock of the Railway was and is owned by the owners of a majority of the stock of the Brewery, so that the same interest controls both properties.

In the year 1888 the Railway leased its tracks to the Iron Mountain for ten years, and in 1898 renewed the lease for ten years. Up to this time the only outlet from the rails of the Railway was to the main line of the Iron Mountain on the bank of the Mississippi River. In 1903 the Railway undertook a further development of its terminal facilities, and the city authorized several extensions along certain streets, and leased to it a part of a public wharf. In 1908 the Railway declined to grant a further lease to the Iron Mountain, and took over the operation of its property, with the object of enlarging and extending its facilities, serving the public in that

portion of the city generally, and connecting with all St. Louis lines by a junction with the St. Louis Transfer Railway.

The principal terminal facilities of the City of St. Louis are dominated by the Terminal Railroad Association, hereinafter referred to as the Terminal, a corporation whose capital stock is owned in equal shares by the 14 trunk lines entering that city. The Terminal, or its proprietary or tenant lines, owns or controls all bridges and ferries giving access to terminals within and lines directly entering St. Louis, so that no interstate shipment can enter or leave the city except over those lines. In St. Louis there are three industrial centers naturally requiring terminal facilities. The northern section of the city along the Mississippi River is one of these, and is served by a considerable mileage of the Terminal and the rails of nine of the trunk lines. In the western section, in what is known as the Mill Creek Valley, there are many industries served by a considerable mileage of the Terminal and the rails of four of the trunk lines. In South St. Louis the companies rendering terminal service are the Manufacturers Railway and the Iron Mountain. The St. Louis Transfer Company, one of the subsidiaries of the Terminal, has a line along the river bank, physically available only to a negligible extent, and the lines of the Iron Mountain generally follow the bank of the river and reach such industries as are adjacent thereto. For a considerable distance along the river in this section of the city there is a steep grade to be overcome in reaching industries situate back from the river, and to confine these industries to the terminal facilities of the Iron Mountain would require a team haul up from the bank of the river. The Railway's terminals reach the high ground referred to, and besides its connection with the Iron Mountain it constructed in 1908 a viaduct leading over the Iron Mountain tracks and then descending to

their level and forming a connection with the tracks of the Transfer Railway, which lie between the Iron Mountain and the river. Through the Transfer Railway it reaches the Terminal, and through the Terminal reaches all the trunk lines that enter St. Louis. The Transfer Railway is a corporation whose stock is owned by the Wiggins Ferry Company, whose stock in turn is owned by some of the trunk lines that own and control the Terminal.

The St. Louis Southwestern Railway Company, a trunk line hereinafter called the Cotton Belt, does not reach St. Louis with its own rails, but enters East St. Louis *via* the rails of the Iron Mountain, over which it has trackage rights. In serving industries within St. Louis it uses the facilities of the Terminal and of the various carriers within the city, including the Railway.

By ordinance of the City of St. Louis the Railway is prohibited from charging more than $2 per car for local switching. Prior to March 1, 1910, and including the entire 20-year period covered by the leases of the Railway to the Iron Mountain, the trunk lines applied their St. Louis rates to traffic originating at or destined to industries served by the Railway, absorbing and paying to the Railway, after the termination of the Iron Mountain lease, a switching charge of from $3 to $5.50 per car, said to average about $4.50. The result of this was that shippers served by the Railway received their transportation at the St. Louis rates without paying anything additional for the terminal service performed by the Railway.

At the same time the trunk lines absorbed the terminal charges of the Terminal (about $3 per car), and similar allowances or absorptions were made by the trunk lines to twelve other industrial lines in and about the city.

About December 31, 1909, the trunk lines by concerted

action notified the Railway that from and after March 1, 1910, they would cancel the tariffs wherein they had applied the St. Louis rates to industries on the Railway and had absorbed the Railway's terminal charges. Similar notice was given to the twelve other industrial lines, and accordingly the allowances were canceled at the date notified, but the practice of absorbing the charges of the Terminal was not discontinued.

On March 4, 1910, the Railway and certain shippers on its line, including the Brewery, filed a complaint against the trunk lines before the Commission (I. C. C. Docket No. 3151), in which it was alleged that the tariff cancellations were in effect an unjust and unlawful refusal by the trunk lines longer to continue through routes and joint rates theretofore established; that said action constituted an unlawful discrimination as between industries and shippers on the lines of the Railway and other industries and shippers in St. Louis, and subjected the traffic of the Railway to undue and unreasonable disadvantage, and gave undue and unreasonable preference to the shipping public in other parts of St. Louis; and further that the concerted action of the trunk lines was the result of an unlawful combination and conspiracy, in violation of the Sherman Anti-Trust Law. Complainants asked that through routes and joint rates be reestablished to and from points on the Railway from and to points on each of the trunk lines and points beyond, and that proper and reasonable divisions of the through or joint rates be established. There was also a prayer for reparation and for general relief.

The trunk lines answered, evidence was taken (none, however, being introduced by the trunk lines beyond such as was brought out by examination of complainants' witnesses), and, after a hearing, the Commission, under date June 21, 1911, filed a first report of its conclusions. 21 I. C. C. 304. It declared that the Railway was a

common carrier, within the provisions of the first section of the Commerce Act, and not a mere plant facility of the Brewery; that it supplied reasonable and necessary terminal facilities to many industries besides the Brewery; and that the payment to it by the trunk lines of a reasonable and just portion of the St. Louis rates for the terminal service rendered by it was not unlawful; that the action of the trunk lines in canceling the divisions and absorptions which for many years had been included in the St. Louis rates had subjected complainant shippers and a considerable portion of the public of South St. Louis to the payment of unjust and unreasonable transportation charges and to undue discrimination and disadvantage; that there had been in effect a failure on the part of the complainant carrier and defendants to agree to the apportionment or division of the rates or charges, and this situation under the statute imposed upon the Commission the duty of adjusting the matter; that in view of the peculiar features of the case detailed in the report (including the heavy shipments to and from the Brewery, and the fact that the same interests owned a majority of the stock of the Railway and of the Brewery), it was important that the allowances to the Railway and the services rendered by it to its patrons in consideration of such allowances should be equitably adjusted, and that the trunk lines should closely guard these features in making any allowances or divisions to the Railway, in order to avoid the charge of unjust discrimination or undue preference or advantage; but that the record before the Commission did not present a sufficient basis for a satisfactory determination of the question as to the reasonable and just division or allowance to the Railway, and the further question as to whether a part of the service performed by it was or was not plant facility service. These questions were reserved for further examination.

After the hearing, and before the making of this first

report, practically all of the carriers published and filed tariffs stating allowances or divisions with the Railway. These were suspended by the Commission pending its decision, and upon the making of the first report an order was entered canceling the suspensions, effective July 15, 1911. No other order was made at that time.

Thereafter a supplemental hearing was had upon which additional evidence was submitted by the trunk lines, and as a result the Commission filed its second report, dated June 21, 1913 (28 I. C. C. 93), but still made no order. In this report the Commission (p. 105) adhered to its former conclusion that the Railway was a common carrier subject to the act, but in other respects materially modified its views, now holding: that the payments formerly made out of their through rates by the trunk lines to the Railway were absorptions in compensation for services rendered to the trunk lines, and were not divisions of joint rates as for services rendered for the shippers served by the Railway, as they would be considered under joint rates prescribed by order of the Commission; that in the absence of any undue discrimination with respect to these absorptions the Commission could make no lawful order with reference thereto; that the defendant trunk lines, in delivering freight at the St. Louis rates to points on the rails of the Terminal and in refusing to bear the expense of similar delivery by the Railway upon its rails, were not subjecting the shippers located on and served by the Railway to undue prejudice and disadvantage; that therefore the only lawful order the Commission could make was in the establishment of joint rates, under which that part of the service performed by the Railway would be in the contemplation of the Commerce Act a service performed for the shipper, to be paid for by him, and not a service rendered for the trunk lines, the expense of which could be required by the Commission to be borne by them; that the trunk line rates to

St. Louis not being shown to be unreasonable in themselves, the joint rates with the Railway necessarily must be in excess of these by the amount of the Railway's part of the through charge, and that joint through rates should be established on that basis. Taking up the question of the amount to be added to the trunk line rates in making the joint rates, the existing allowances being, as stated, from $3.00 to $5.50 per car, and complainants asking for a uniform allowance of $4.50 per car, said to be lower on the average, the Commission called attention to the fact that the Railway's rate for local shipments between any points on its line was $2 per car, fixed as a maximum by city ordinance; for intra-plant movements, availed of only by the Brewery—that being the only industry having need for such service—$1 per car; and for weighing movements 25 cents per car; and that the Railway had a contract with the Cotton Belt under which it handled shipments for the latter, under certain exemptions from liability for damage, for $1 per car, and had offered the same contract to other carriers. Considering these facts with the other testimony submitted on this phase of the case, the Commission expressed the opinion that the division of the joint rates accruing to the Railway should not exceed $2 per car, saying: "However, we shall not by definite finding and order fix these divisions now. This is our original finding with respect to the establishment of joint rates, and the carriers, in accordance with the provisions of the act, will be given an opportunity to agree among themselves." In conclusion the Commission announced: "We regard the present allowances which, as stated, average slightly above $4.50 per car, as effecting unlawful results."

Following the partial decision of the Commission in its first report, most of the trunk lines reinstated the allowances to the Railway, and those allowances, averaging about $4.50 per car, were being paid at the time of

the making of the second report.    Pursuant to that report, they were canceled.

In this situation the Railway, the Brewery, and other complainant shippers applied to the Commission for a rehearing, and the case was reargued and taken under advisement November 13, 1913.    Pending its decision, and on December 7, 1913, the Cotton Belt and another trunk line, both defendants in I. C. C. Docket No. 3151, published and filed with the Commission tariffs to become effective January 7, 1914, providing for absorption of the switching charges of the Railway up to $4.50 per car.    These absorptions were suspended by order of the Commission December 19, 1913, until May 7, 1914, and by an order dated April 20, 1914, were suspended for a further period of six months, or until November 7, 1914. The suspension case was designated as Investigation and Suspension Docket No. 355, and was treated by the Commission as ancillary to the principal case, I. C. C. Docket No. 3151.

Under date July 10, 1914, and prior to the expiration of the second period of suspension, the Commission filed its third and final report, 32 I. C. C. 100.    It affirmed the findings and conclusions contained in the second report, with an "interpretation"; still dealt with the Railway as a common carrier; held that the trunk lines by their action in canceling the allowances to the Railway while continuing to absorb the charge of the Terminal, whose stock they owned, did not subject the Railway or its shippers to undue prejudice or disadvantage; that the amounts formerly paid by the trunk lines to the Railway were voluntary allowances and could not be considered by the Commission to be divisions of joint rates which it could by affirmative order establish; that the separate rates of the trunk lines and of the Railway being necessarily regarded upon the record before the Commission as *prima facie* reasonable, any joint rates which

the Commission could by affirmative order require the carriers in the through route to establish would necessarily be higher than the trunk line rates to and from St. Louis by the amount of that part of the through charge which would accrue to the Railway; that while the Commission could not require the trunk lines to participate with the Railway in joint rates no higher than their rates to St. Louis, they might voluntarily participate on that basis, provided that in the division they did not pay to the Railway for its service more than was just and reasonable, and did not thereby in the amount of the excess indirectly refund to the Brewery a part of the through transportation charges paid to them by the Brewery; that the former allowances of $4.50 per car paid by the trunk lines to the Railway were excessive; and, instead of a maximum division to the Railway of $2 per car, as suggested in the second report, upon further consideration the view was expressed that the division accruing to the Railway should not exceed $2.50 per car, subject to modification upon further hearings with respect to divisions if the necessity should arise

In announcing its purpose to make an order requiring the establishment and maintenance by complainant Railway and defendant trunk lines of maximum joint rates not exceeding the St. Louis rates of the trunk lines by more than $2.50 per car, the Commission declared that when this had been done, whether the carriers in the through routes should establish rates on that maximum basis, or by voluntary agreement on a basis not higher than the St. Louis rates, then, upon failure of the trunk lines and the Railway to agree upon the proper basis of division, and upon request made to the Commission for the purpose, it would fix the divisions upon further investigation as provided in the act; if that inquiry should confirm its present impression that $2.50 per car was a reasonable division to the Railway, that would be granted;

and if, on the other hand, the Commission should be convinced by the evidence that $2.50 per car was too much or not enough, it would fix the amount accordingly; and that if not asked by the carriers to fix the divisions, the Commission, upon proper cause appearing, might in its discretion institute an inquiry upon its own motion, under those provisions of the act which forbid the giving or receiving of rebates or undue concessions, directly or indirectly, by any device whatsoever, having in mind particularly the fact of the common ownership of Railway and Brewery stock.

Thereupon an order was made under I. C. C. Docket No. 3151, dated July 10, 1914, requiring the trunk lines and the Railway on or before January 1, 1915, to cease and desist from charging their then present rates on traffic between points on the line of the Railway and points on the trunk lines in other States to the extent that those rates exceeded contemporaneous St. Louis rates by more than $2.50 per car, and to put in force on or before the same date and maintain thereafter for a period of not less than two years rates applicable to traffic on the Railway not exceeding rates contemporaneously in effect between St. Louis and points in other States by more than $2.50 per car.

At the same time, and upon the basis of the same report, an order was made under I. & S. Docket No. 355, canceling the Cotton Belt tariff that had been suspended by the orders of December 19, 1913, and April 20, 1914.

The former order of July 10 was attacked in a suit brought in the District Court by the Railway, in which the Brewery and other shippers on the line of the Railway intervened as co-petitioners. Answers were filed by the United States and the Interstate Commerce Commission, evidence was taken, and upon final hearing the suit was dismissed, without opinion. No. 25 is an appeal from

this decree. The orders of April 20 and July 10 under I. & S. Docket No. 355 were the subject of attack in a suit by the Railway and the Cotton Belt, in which answers were filed by the United States and by the Interstate Commerce Commission, and upon evidence taken the court, without opinion, dismissed the petition. From this decree the appeal in No. 24 was taken.

*Mr. Sidney F. Andrews* and *Mr. Daniel N. Kirby*, with whom *Mr. Charles Nagel* was on the briefs, for appellants:

The reasonableness *per se* of the advanced rates, made effective by the cancellation of the tariffs, was in issue and was actually passed upon by the Commission. The cancellation of the absorptions constituted an "increase" of the former rates. 30 I. C. C. 501, 503; *id.* 388, 389. See also 30 I. C. C. 16; *id.* 349; *id.* 538, 545; *id.* 696, 699; 31 I. C. C. 633, 635; 29 I. C. C. 653; *id.* 70, 78. And the burden rested on the trunk line carriers to justify the increase. Commerce Act, § 15; 30 I. C. C. 415, 419; *id.* 581, 583; 31 I. C. C. 351, 355; *id.* 573, 582; 30 I. C. C. 505, 508.

In the absence of proof to the contrary a presumption arose from the long continuance of the former rates that they were *per se* reasonable. *Interstate Commerce Commission* v. *Chicago, Burlington & Quincy R. R. Co.*, 186 U. S. 320, 336; 26 I. C. C. 402, 404; *id.* 422, 429; 31 I. C. C. 244, 253; 34 I. C. C. 234, 247; 35 I. C. C. 47, 68. The reasonableness of the advanced rates was assumed by the Commission without evidence.

The carrier may increase a rate or it may curtail the service performed for it, but if such action is challenged it must bear the burden of showing that the new rate or service is reasonable and free from unjust discrimination. 34 I. C. C. 242. In its second report the Commission held that while the trunk lines might voluntarily extend their

service to points on the Manufacturers Railway at the
St. Louis rates, they could not be compelled to do so;
the reason being that their rates to the ends of their own
rails were reasonable *per se*, and that therefore for any
service beyond they would be entitled to additional com-
pensation. Hence the assumption of the reasonableness
of their rates to the end of their rails formed the founda-
tion of the conclusion. For more than twenty years,
the former rates of the trunk lines had included such
service beyond their own rails (first report, 21 I. C. C.
313), and under their new tariffs the carriers were per-
forming a less service for the same compensation, which
was equivalent to an advance in their rates. A proper
determination, therefore, of the issue of the reasonableness
*per se* of the advanced rates was all-controlling. Such
finding having been made without evidence, the order
based thereon was void and should have been set aside.
*Interstate Commerce Commission* v. *Louisville & Nashville
R. R. Co.*, 227 U. S. 88, 91; *Florida East Coast Ry. Co.* v.
*United States*, 234 U. S. 167.

The advanced rates were presumptively unreasonable
because established not by free competition but by joint
and concerted action of the trunk lines, pursuant to their
conspiracy to further the unlawful monopoly known as
the Terminal Railroad Association of St. Louis. Appel-
lants did not and do not seek to have the Association,
either directly or through its proprietary lines, declared
a monopoly, or enjoined or punished in any way as a
monopoly. They did and do contend that the Sherman
Act is pertinent and necessary to be taken into considera-
tion, because it is a part of the law of the land. While
it does not confer special jurisdiction on the Commission,
or the Commerce or District Courts in reviewing orders
of the Commission, it does enter into the duties and
powers of the Commission as a limitation upon and qual-
ification of them, and it enters also into the duties of

carriers toward each other and toward the shipping public, as a limitation and qualification upon them. When an increase in rates results from free competition, it is entitled (in the absence of statute providing otherwise) to the presumption of reasonableness; on the other hand, when a change in rates is shown to have resulted from unlawful concert of action, prompted by motives which preclude a consideration of the reasonable merits of such action, then no presumption of reasonableness can attach, and, in such a case, the circumstances showing motive and unreasonableness become a pertinent and important subject of inquiry, as tending to show unreasonableness. 21 I. C. C. 316; 10 I. C. C. 505, 540; 12 I. C. C. 236, 241. The facts showing unlawful conspiracy violative of the Sherman Act are proper to be considered as compelling the conclusion that the cancellation tariffs, the increase of rates resulting therefrom, and the attitude of the trunk lines throughout toward the Railway and its shippers are presumptively unreasonable, unjust, and intended to be discriminatory.

In the absence of proof sustaining the reasonableness *per se* of the advanced rates, and in view of the presumption of the reasonableness *per se* of the former rates, and of the further presumption that the increased rates were unreasonable, the only valid order which the Commission could have made was a mandatory one commanding the carriers to restore their former rates. It was this for which complainants contended. 28 I. C. C. 110. Under similar circumstances such a course has been frequently followed by the Commission. 23 I. C. C. 518, 519. See 34 I. C. C. 234.

When the ultimate facts are admitted or not in dispute, the legal effect of those facts presents a question of law, and is reviewable as such.

The Commission based its conclusion that there was no undue discrimination entirely upon its further conclusion

(which was purely a conclusion of law, not involving any inference of fact), that the terminal service performed by the lines of the Terminal and of its operating subsidiaries and of the terminal facilities of the Iron Mountain, and of the five other trunk lines, which perform terminal switching in St. Louis in connection with other line carriers, must as a matter of law be treated as part of the line haul of the trunk lines, and not as distinct terminal services performed by independent terminal carriers competing with the Railway; and this notwithstanding the fact that, while refusing to continue to absorb the terminal charges of the Railway, the trunk lines were at the same time continuing to absorb the terminal charges of the Terminal and of the Transfer Railway, and of the various trunk lines which performed terminal services in St. Louis. By that interpretation of the law, the Commission permitted the trunk lines to deny the St. Louis rate to shippers on the Railway, while at the same time permitting it to all shipping competitors within the same switching zone (the City of St. Louis), and thus placed the Railway and its shippers at the disadvantage of having higher rates than any other shipping points in St. Louis, and put them at the mercy of the trunk lines owning the Terminal, by holding that while the trunk lines might by voluntary act as a matter of grace absorb (or refuse to absorb) the charges of the Railway, the Commission could not compel them to do so.

It is a necessary conclusion from the decision of this court in the *Terminal Case*, that if the Terminal be held an integral part of the trunk lines and its service a part of their line haul, then the combination is unlawful and would be dissolved; if, on the other hand, it is an independent institution, "solely engaged in operating terminal facilities," performing a distinct terminal service (not a part of the line haul), then it is lawful, but in the latter case it must be treated as an independently

operating terminal carrier, for all purposes of competition.

The trunk lines (before this court) justified the Terminal's continued existence on the ground that it is an independent terminal carrier, but on the other hand, in their treatment of the Railway, they discriminated in favor of the Terminal and in favor of its shippers and in favor of each other and against this competitor, on the ground that the Terminal is legally an integral part of the trunk lines, and its service a part of the line haul, and they thereby contravened the decision of this court in the *Terminal Case.*

Yet that is precisely what the Commission held they might do, since its decision of "no discrimination" was based squarely upon its holding that the Terminal was not an independent terminal system.

Nor can the conclusion of the Commission on the status of the Terminal be sustained on the ground that the trunk lines own all of its shares of stock. *Interstate Commerce Commission* v. *Stickney,* 215 U. S. 98, 108; *United States* v. *Union Stock Yards Co.,* 226 U. S. 286.

The Commission erred in concluding that the terminal facilities of each of the six trunk lines which perform terminal switching in St. Louis should be treated as merely extensions of the rails of all the other trunk lines; and that the terminal switching performed by each in connection with the line haul performed by another trunk line should be treated as a part of the line haul of the latter.

The Commission also erred as a matter of law in holding that the existence of "reciprocal switching" relations between the trunk lines made their St. Louis terminals mere extensions of the rails of all the trunk lines, and made the terminal service performed by them a part of the line haul. *Pennsylvania Co.* v. *United States,* 236 U. S. 351; *Louisville & Nashville R. R. Co.* v. *United States,* 238 U. S.

1, 16, 17; *Louisville & Nashville R. R. Co.* v. *United States*, 227 Fed. Rep. 258, 269.

The decision of the Commission on the question of discrimination is directly contrary to its decisions in analogous cases. 34 I. C. C. 234, 237; 28 I. C. C. 101; 29 I. C. C. 212; 34 I. C. C. 596, 601; 37 I. C. C. 497; 36 I. C. C. 146.

The Commission erred in the view that there is a legal distinction between "divisions of joint rates," and "absorptions of switching charges;" that it lacked power to prescribe "absorptions;" and that therefore the restoration of the Railway's canceled absorptions must be left to the volition of the trunk lines. ' 28 I. C. C. 103. The Commission had this authority under its powers to establish maximum joint rates and to prescribe divisions. Commerce Act, §§ 1, 3, 15. Discrimination by carriers against connecting lines is forbidden by § 3. The "use of tracks" in § 3 does not mean an extension of service through divisions or allowances. *Pennsylvania Co.* v. *United States*, 214 Fed. Rep. 445, 447; 236 U. S. 351.

Divisions and allowances are identical in substance, each being an agreed participation in the revenue arising out of a through and joint rate. *Fourche River Lumber Co.* v. *Bryant Co.*, 230 U. S. 316, 322, 323. The distinction that allowances relate to services rendered for a trunk line and divisions to services rendered a shipper is erroneous. In each case the service is for a tariff charge, paid out of a through joint rate at a figure agreed to by all participating carriers, and the service of each participating carrier is rendered for the shipper.

The Commission erred in holding that under no circumstances is a carrier entitled to reparation, and in ignoring the prayer of the complaining shippers for reparation. Commerce Act, §§ 3, 8, 9, 13. Although the order is silent concerning the reparation prayed for, and is thus negative in form, its denial of a lawful right is

affirmative in effect. *United States* v. *Atchison, Topeka & Santa Fe Ry. Co.*, 234 U. S. 476.

The order of the Commission suspending the tariff of the Cotton Belt for a period of six months is arbitrary and made without lawful authority and in effect a denial of due process of law. Commerce Act, § 15; *American Sugar Refg. Co.* v. *Delaware, Lackawanna & Western R. R. Co.*, 207 Fed. Rep. 733; *Akerly* v. *Vilas*, 24 Wisconsin, 171; *Interstate Commerce Commission* v. *Louisville & Nashville R. R. Co.*, 227 U. S. 88, 93.

The order is confiscatory.

*Mr. D. Upthegrove, Mr. A. L. Burford* and *Mr. Edward A. Haid* filed a brief for St. Louis Southwestern Ry. Co. in No. 24.

*Mr. Blackburn Esterline*, Special Assistant to the Attorney General, with whom *The Solicitor General* was on the brief, for the United States.

*Mr. Joseph W. Folk* for the Interstate Commerce Commission.

MR. JUSTICE PITNEY, having made the foregoing statement, delivered the opinion of the court.

It will be convenient to dispose first of No. 25.

The scope of the order of July 10, 1914, under I. C. C. Docket No. 3151, is simple and limited; the grounds of attack upon it are many and diverse, and based rather upon what it does not, than upon what it does, require to be done. As is pointed out in the prefatory statement, the complaint before the Commission was made by the Railway, the Brewery, and certain other shippers served by the Railway. The respondents were the trunk lines. The complaint charged that the then recent tariff can-

cellations were in effect a refusal to continue through routes and joint rates from and to points on the line of the Railway; alleged that this constituted unreasonable discrimination between shippers on the line of the Railway and other shippers in the City of St. Louis, and subjected the former to undue prejudice and disadvantage, contrary to § 3 of the Commerce Act (24 Stat. 379, 380, c. 104); and prayed that the trunk lines be required to reëstablish the through routes and joint rates as they existed before the cancellations, that the reasonable divisions of the rates be determined, and that due reparation be awarded to the complainants, with such other relief as the Commission might deem necessary. The order under consideration, recognizing through routes as being already in effect (a fact about which there is no dispute), required the Railway and the trunk lines to establish, and for at least two years to maintain, rates not exceeding by more than $2.50 per car the trunk line rates contemporaneously in effect between St. Louis and points in other States.

It is urged that the cancellation of the absorption tariffs on March 1, 1910, constituted an increase of the former rates because it curtailed the service to be rendered under those rates; that the former absorptions presumably resulted in reasonable rates (*Interstate Commerce Commission* v. *Chicago, Burlington & Quincy R. R. Co.*, 186 U. S. 320, 336); that by the "increased rate clause" of § 15 of the Commerce Act as amended in 1910 (36 Stat. 552, c. 309),[1] the burden was upon the trunk lines to show

---

[1] "At any hearing involving a rate increased after January first, nineteen hundred and ten, or of a rate sought to be increased after the passage of this act [June 18, 1910], the burden of proof to show that the increased rate or proposed increased rate is just and reasonable shall be upon the common carrier, and the commission shall give to the hearing and decision of such questions preference over all other questions pending before it and decide the same as speedily as possible."

the reasonableness of the new rates; and that, there being no evidence to sustain their reasonableness *per se,* the Commission erred in law in failing to set them aside by restoring the former absorptions.

But this clause of § 15, by the fair import of its terms, imposes upon the carrier the burden of proving the new rate to be just and reasonable, only where that question is involved in the hearing; it does not call for proof as to matters not in controversy. As the Commission pointed out in its several reports (21 I. C. C. 308; 28 I. C. C. 100–101, 103, 105; 110; 32 I. C. C. 102, 105), the complaint was not directed to the reasonableness of the separate rates either of the Railway (one of the complainants) or of the trunk lines. The effort was to require the re-establishment of the former absorptions on the ground that without them the continued practice of absorbing the charges of the Terminal constituted a discrimination as against shippers on the line of the Railway. And when the question of discrimination was finally decided against the contention of the complainants, and the claim of the Railway to be regarded as a common carrier was decided in their favor (both conclusions being supported by ade-quate evidence), it appearing that through routes actually were in effect after as before the cancellations, the Com-mission deemed it unnecessary to do more at that time than to fix a maximum for the joint rates, and then await the voluntary action of the Railway and the trunk lines about establishing joint rates within the maximum, and agreeing between themselves respecting divisions.

The question of the reasonableness of the allowances or divisions made and to be made to the Railway came into the case incidentally, but inevitably, because of the heavy shipments to and from the Brewery and the com-munity of interest between it and the Railway. Upon this point there was abundant evidence to support the conclusion of the Commission that in making up the

joint rates not more than $2.50 per car should be added to the trunk line rates to St. Louis, and the intimation (not final, and not carried into the order) that any division to the Railway out of the joint rate in excess of $2.50 per car would amount to an undue preference or indirect rebate to the Brewery. Beyond this, no question of separate rates was involved, and the Commission did not err, in view of the issues, in assuming the trunk line rates to be reasonable *per se.* Although it might have dealt with the divisions in the same order, so far as necessary to prevent undue favoring of the Brewery (*O'Keefe* v. *United States,* 240 U. S. 294, 300–302), it was within the discretion of the Commission to allow the carriers to make their own agreement upon the subject, as contemplated by the first paragraph of § 15 of the act (36 Stat. 551), subject to its review.

It is insisted that the "advanced rates" resulting from canceling the absorptions were presumptively unreasonable because not established by free competition but by concerted action in furtherance of the aims of the Terminal Railroad Association of St. Louis, held by this court to be an unlawful combination in restraint of interstate commerce. *United States* v. *St. Louis Terminal,* 224 U. S. 383. But our decision in that case (224 U. S. 412; 236 U. S. 207–9) left untouched the powers of the Interstate Commerce Commission. Besides, appellants sought no special relief because of the Anti-Trust Act. Hence at the utmost they were only entitled to have the Commission consider the nature and objects of the Terminal Association as circumstances bearing upon the question of discrimination and other questions to which they were pertinent; and this the Commission did. 21 I. C. C. 308, 314; 28 I. C. C. 98, 104–106, 109–110; 32 I. C. C. 102.

It is insisted, however, that the finding to the effect that it was not an undue or unjust discrimination for the trunk lines to refuse to absorb the Railway's charges and

thereby extend their flat St. Louis rates to the territory served by the Railway, while doing so with respect to the territory served by the Terminal, is contrary to the indisputable character of the testimony and inconsistent in law with the very facts found by the Commission. To this we cannot accede. It is not any and every discrimination, preference, and prejudice that are denounced by the Commerce Act. Section 3 (Act of February 4, 1887, c. 104, 24 Stat. 379, 380) renders unlawful any "*undue or unreasonable*" preference or advantage, prejudice or disadvantage. In the same section the requirement of "all reasonable, proper, and equal facilities for the interchange of traffic" is qualified so as not to require one carrier to give the use of its tracks or terminal facilities to another. And in the first paragraph of amended § 15 (36 Stat. 551) it is rates, regulations, or practices that in the opinion of the Commission are "*unjustly* discriminatory, or *unduly* preferential or prejudicial," etc., to which the prohibition is to be applied.

Whether a preference or advantage or discrimination is undue or unreasonable or unjust is one of those questions of fact that have been confided by Congress to the judgment and discretion of the Commission (*Interstate Commerce Commission* v. *Alabama Midland Ry. Co.*, 168 U. S. 144, 170), and upon which its decisions, made the basis of administrative orders operating *in futuro*, are not to be disturbed by the courts except upon a showing that they are unsupported by evidence, were made without a hearing, exceed constitutional limits, or for some other reason amount to an abuse of power. This results from the provisions of §§ 15 and 16 of the Commerce Act as amended in 1906 and 1910 (34 Stat. 589–591, c. 3591; 36 Stat. 551–554, c. 309), expounded in familiar decisions. *Interstate Commerce Commission* v. *Illinois Central R. R. Co.*, 215 U. S. 452, 469–470; *Interstate Commerce Commission* v. *Union Pacific R. R. Co.*, 222 U. S. 541, 547; *Procter &*

*Gamble Co.* v. *United States,* 225 U. S. 282, 297–298; *Interstate Commerce Commission* v. *Louisville & Nashville R. R. Co.,* 227 U. S. 88, 91.

In the present case the negative finding of the Commission upon the question of undue discrimination was based upon a consideration of the different conditions of location, ownership, and operation as between the Railway and the Terminal.  28 I. C. C. 104, 105; 32 I. C. C. 102. The conclusions were reached after full hearing, are not without support in the evidence, and we are unable to say that they show an abuse of discretion.  It may be conceded that the evidence would have warranted a different finding; indeed the first report of the Commission was to the contrary; but to annul the Commission's order on this ground would be to substitute the judgment of a court for the judgment of the Commission upon a matter purely administrative, and this can not be done.  *United States* v. *Louisville & Nashville R. R. Co.,* 235 U. S. 314, 320; *Pennsylvania Co.* v. *United States,* 236 U. S. 351, 361.  The common use of the St. Louis Terminal by the fourteen trunk lines under a single arrangement as to absorption of the terminal charges does not, as matter of law, entitle the Railway, which has no trunk line and does terminal switching alone, to precisely the same treatment.  *United States* v. *St. Louis Terminal,* 224 U. S. 383, 405, 406; *Louisville & Nashville R. R. Co.* v. *United States,* 242 U. S. 60.

Criticism is directed to the somewhat abstruse distinction drawn by the Commission between allowances or absorptions made by trunk lines in compensation for services rendered to them and divisions out of joint rates as for services rendered for the shippers (28 I. C. C. 101–106; 32 I. C. C. 102); but we deem it unnecessary to discuss the point.  See *Tap Line Cases,* 234 U. S. 1, 28; *United States* v. *Butler County R. R. Co.,* 234 U. S. 29, 35–36; *O'Keefe* v. *United States,* 240 U. S. 294, 302.

It hardly can have escaped attention that the real com-

plaint of appellants respecting the order now under consideration is directed not to what the order requires to be done, but to what it does not require. It granted a part of the relief for which appellants had applied to the Commission. Recognizing the Railway as a common carrier to which allowances and divisions might be accorded by the trunk lines, and that through routes were in operation between the Railway and those lines, it fixed the maximum joint rates, and went no further for the present. The real ground for resorting to the courts in this case is the failure to fix divisions. In effect the District Court was asked to perform a function specifically conferred by law upon the Commission. But that court has only the same jurisdiction that formerly was vested in the Commerce Court (Act of June 18, 1910, c. 309, 36 Stat. 539; Act of October 22, 1913, c. 32, 38 Stat. 208, 219); and it is settled that this does not permit the court to exercise administrative authority where the Commission has failed or refused to exercise it, or to annul orders of the Commission not amounting to an affirmative exercise of its powers. *Procter & Gamble Co.* v. *United States*, 225 U. S. 282, 292, *et seq.*

Complaint is made because reparation was not awarded. But we are unable to see that proper foundation was laid for this in the evidence submitted to the Commission.

Nothing more need be said concerning No. 25.

The first question raised in No. 24 is based upon the language of the second paragraph of § 15 of the Commerce Act, inserted by the amendment of June 18, 1910, c. 309, 36 Stat. 539, 552.[1] It is said that the tariff published by

---

[1] "Whenever there shall be filed with the commission any schedule stating a new individual or joint rate, fare, or charge, or any new individual or joint classification, or any new individual or joint regulation or practice affecting any rate, fare, or charge, the commission shall have, and it is hereby given, authority, either upon complaint or upon its own initiative without complaint, at once, and if it so or-

the Cotton Belt December 7, 1913, was a new tariff within the meaning of this provision, and while the Commission was authorized, either upon complaint or on its own initiative, to suspend its operation pending a hearing, this suspension must not be for a longer period than 120 days beyond the time when the tariff would otherwise go into effect unless the hearing could not be concluded within that period, in which case alone the Commission might extend the time of suspension for a further period not exceeding six months. It is contended that no hearing on the matters involved in the suspended tariff was begun within the 120 days, and therefore the second order of suspension, and also the order canceling this tariff, were arbitrary and unlawful; the argument being that the issues involved in I. C. C. Docket No. 3151 were not the same as those presented in the matter of the suspended tariff, I. & S. Docket No. 355, and hence there was no hearing whatever on the latter.

ders, without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon a hearing concerning the propriety of such rate, fare, charge, classification, regulation, or practice; and pending such hearing and the decision thereon the commission upon filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension may suspend the operation of such schedule and defer the use of such rate, fare, charge, classification, regulation, or practice, but not for a longer period than one hundred and twenty days beyond the time when such rate, fare, charge, classification, regulation, or practice would otherwise go into effect; and after full hearing, whether completed before or after the rate, fare, charge, classification, regulation, or practice goes into effect, the commission may make such order in reference to such rate, fare, charge, classification, regulation, or practice as would be proper in a proceeding initiated after the rate, fare, charge, classification, regulation, or practice had become effective: *Provided*, That if any such hearing can not be concluded within the period of suspension, as above stated, the Interstate Commerce Commission may, in its discretion, extend the time of suspension for a further period not exceeding six months."

The form of the orders made by the Commission in I. & S. Docket No. 355 lends color to this argument. The order of December 19, 1913, makes no reference to the proceedings then pending in I. C. C. Docket No. 3151, treats the tariff recently filed as "stating new individual regulations and practices affecting rates and charges," declares that the Commission will enter upon a hearing concerning their propriety, and directs that their operation be postponed until the 7th of May; while the order of April 20 refers to the former one, recites that "such hearing cannot be concluded within the period of suspension above stated," and orders a further suspension until the 7th of November.

But it is not suggested, and there is no ground for supposing, that the parties were misled by the form of these orders. They were parties to I. C. C. Docket No. 3151, then pending. The Cotton Belt was one of the carriers which had canceled the former tariffs authorizing allowances averaging $4.50 per car to the Railway, and the Railway having complained to the Commission of its action, it answered declaring among other things that it canceled the tariff for the reason that it was advised that the allowances theretofore made to the Railway were illegal because the Railway was merely an industrial or tap line and under the law not entitled to any part of the through rate, and further that if the Railway was entitled to compensation as a carrier it was not entitled to receive from the Cotton Belt any allowance out of the through rate, that if entitled to any it was not entitled to the allowance theretofore paid to it under the canceled tariff, and that the allowance given to the Railway was unreasonable, excessive, and unjust.

The issues raised by this answer and by the answers of the other defendant trunk lines, which are briefly recited in the first report (21 I. C. C. 307) but need not be here repeated, necessarily involved, and were treated by the

Commission as involving, the question how much could
be allowed by the trunk lines to the Railway out of the
through rate without amounting to an undue preference
or indirect rebate to the Brewery because of the com-
mon control of the Brewery and the Railway. Special
attention was called to this in the first report, as appears
from what has been recited in the statement prefacing
this opinion. And it is obvious that the same consider-
ation was inherent in the case, whether the payments by
the trunk lines to the Railway were considered as divisions
of joint rates for services rendered for the shippers served
by the Railway, or absorptions in compensation for serv-
ices rendered by the Railway for the trunk lines. In
either case, if the allowances to the Railway were made un-
duly large, the Brewery's share of the profit accruing from
them would amount to an indirect preference to the Brew-
ery. *Tap Line Cases,* 234 U. S. 1, 28; *O'Keefe* v. *United
States,* 240 U. S. 294, 301–302. Accordingly, in the second
report (28 I. C. C. 107), the Commission said: "Com-
plainant railway itself concedes that this question of the
amount of the allowance to the railway, but not the ques-
tion of whether a reasonable allowance should be made, is
a matter for closer investigation owing to the common own-
ership of the stock of the railway and of the brewery, its
statement in this respect, however, being based of course
upon the understanding that the allowance was to come
from the trunk lines." And in the concluding part of its
report, the Commission stated (p. 111): "Should one or
more of the trunk lines attempt to pay to the railway
[more than] the $2 per car which we suggest herein as be-
ing in our opinion reasonable for the latter's shippers to
pay for its service, another question would be presented
in which would figure the fact, much discussed in the rec-
ord, of the common ownership of the stock of the railway
and of the brewery. That question would not arise pri-
marily under section 15 of the act, but under those sections

which seek to prohibit the giving of unlawful concessions by any device whatsoever.  It follows from what we have said herein that we regard the present allowances which, as stated, average slightly above $4.50 per car, as effecting unlawful results."  This was on June 21, 1913; pursuant to the report the criticised allowances were canceled; and on November 13 in the same year the case was submitted to the Commission upon a rehearing at the instance of the Railway.  The Cotton Belt remained a party to the proceeding.  The issues raised by its answer had not been finally disposed of, nor its answer withdrawn.  Since it involved the public interests, and not merely those of the Cotton Belt, this particular issue hardly could be withdrawn.

The question of the validity of the previous allowances, approximately $4.50 per car, or of any allowance greater than $2.00 per car, being thus bound up in the pending controversy under I. C. C. Docket No. 3151, the Cotton Belt tariff published December 7, 1913, while the Commission had that controversy under advisement, manifestly was an attempt to forestall the decision.  There was no error in suspending it pending the decision.  And, there being nothing further to be submitted to the Commission in the way of evidence or argument, it was natural, and not inconsistent with the substantial rights of the parties, for the Commission to treat the suspension of the Cotton Belt tariff as a proceeding ancillary to the other, involving no different question on the merits.

The final order setting this tariff aside necessarily rested upon a finding that the proposed absorption was so unduly large as to amount to a preference or indirect rebate to the Brewery.  In orders of this kind, not including an award of damages, formal and precise findings no longer are necessary; § 14 having been amended in this respect by Act of June 29, 1906, c. 3591, 34 Stat. 584, 589.  See House Report No. 591, 59th Cong., 1st sess., p. 4, explaining this provision of the bill.

What we have said disposes at the same time of the only objection raised against the order of April 20, 1914.

The Railway makes the additional contention that the order of July 10, 1914 (I. & S. Docket No. 355), prohibited the Cotton Belt from paying to the Railway as much as $4.50 per car for its services, and that it amounted to a taking of the Railway's property without due process of law in violation of the Fifth Amendment, because any rate less than that named would be confiscatory. That the order has the effect of prohibiting the Cotton Belt from paying to the Railway as much as $4.50 per car is alleged in the petition of the appellants and admitted in the answer of the United States, and we take it for granted that this is so. It is argued that it was operative upon all the trunk lines, and it is contended that payments by all of these lines upon all interstate car interchanges of any rate less than $4.50 per car would not yield in the aggregate a reasonable return upon the fair value of the Railway's property devoted to the use of interstate commerce.

As a part of the argument, it is urged that the decision of the Commission actually limits the earnings of the Railway to $2.50 per car, alleged to be wholly inadequate. But the order under attack in this suit has no such effect; and the contemporaneous order under I. C. C. Docket No. 3151 merely limits the joint rates to not exceeding $2.50 in advance of the St. Louis rates, and does not deal with the divisions; the opinion expressed upon this point being only tentative.

Appellees contend that the finding of the Commission upon the subject of confiscation is conclusive; or at least that it is not subject to be attacked upon evidence not presented to the Commission, as is attempted here. We cannot sustain this objection in its entirety. It is true that so long as the Commission proceeds in accordance with the requirements of the Commerce Act and its amendments, and with proper regard for constitutional restrictions, its

administrative orders, not calling for the payment of money, if made after due hearing and supported by evidence, are not subject to attack in the courts. This, as we have seen, results from the provisions of §§ 15 and 16 of the act as amended. *Interstate Commerce Commission* v. *Illinois Central R. R. Co.*, 215 U. S. 452, 469–470; *Interstate Commerce Commission* v. *Union Pacific R. R. Co.*, 222 U. S. 541, 547; *Procter & Gamble Co.* v. *United States*, 225 U. S. 282, 297–298; *Interstate Commerce Commission* v. *Louisville & Nashville R. R. Co.*, 227 U. S. 88, 91. But these cases recognize that matters of constitutional right are not to be conclusively determined by the Commission; and we are not prepared to say that a party is debarred from attacking an order of the Commission upon constitutional grounds even though they were not taken in the hearing before that body.

Nevertheless, correct practice requires that, in ordinary cases, and where the opportunity is open, all the pertinent evidence shall be submitted in the first instance to the Commission, and that a suit to set aside or annul its order shall be resorted to only where the Commission acts in disregard of the rights of the parties. This was recognized before the amendment of 1906, and when by §§ 14, 15, and 16 of the original Act of February 4, 1887, c. 104, 24 Stat. 379, 384, as amended by Act of March 2, 1889, c. 382, 25 Stat. 855, the findings made by the Commission upon questions of fact were limited in their effect to that of *prima facie* evidence in all cases and not only, as now, in reparation cases. *Cincinnati, New Orleans & Texas Pacific Ry. Co.* v. *Interstate Commerce Commission*, 162 U. S. 184, 196; *Texas & Pacific Ry. Co.* v. *Interstate Commerce Commission*, 162 U. S. 197, 235, 238; *Louisville & Nashville R. R. Co.* v. *Behlmer*, 175 U. S. 648, 675; *East Tennessee &c. Ry. Co.* v. *Interstate Commerce Commission*, 181 U. S. 1, 27; *Illinois Central R. R. Co.* v. *Interstate Commerce Commission*, 206 U. S. 441, 454. The 1906

amendment, in modifying § 14 so as to dispense with the necessity of formal findings of fact except in cases where damages (or reparation) are awarded, and §§ 15 and 16 so as to give a greater effect than before to the orders of the Commission other than those requiring the payment of money, renders it not less but more appropriate that, so far as practicable, all pertinent objections to action proposed by the Commission and the evidence to sustain them shall first be submitted to that body. Hence, we cannot approve of the course that was pursued in this case, of withholding from the Commission essential portions of the evidence that is alleged to show the rate in question to be confiscatory. Certainly, where the Commission, after full hearing, has set aside a given rate on the ground that it is unreasonably high, it should require a clear case to justify a court, upon evidence newly adduced but not in a proper sense newly discovered, in annulling the action of the Commission upon the ground that the same rate is so unreasonably low as to deprive the carrier of its constitutional right of compensation.

However, the issue is in the case and must be dealt with. In order to show that any rate less than $4.50 would be non-compensatory, the Railway undertook to demonstrate that the full $4.50 would not pay the cost of transportation and yield a just return upon the value of its property. Yet the rates voluntarily established by the Railway prior to the commencement of the present controversy averaged about $4.50 per car, a $4.50 rate was provided for in a tariff issued by the Railway in February, 1913, a uniform allowance of this amount was asked for by it upon the second hearing before the Commission, and the Railway concurred in, and now seeks to maintain, the Cotton Belt tariff which contemplated payment of that rate for its services. Besides, the rate may be compared with $3 per car charged by the Terminal for similar services, $2 per car fixed by city ordi-

nance as the Railway's maximum charge for local ship-ments between any points on its line, the charge of $1 per car voluntarily established by the Railway for intra-plant movements, 25 cents per car for weighing move-ments, and the special charge of $1 per car on limited liability, obtaining between the Railway and the Cotton Belt and offered to other carriers. The evidential effect of the Railway's voluntary action is obvious. *Interstate Commerce Commission* v. *Chicago, Burlington & Quincy R. R. Co.*, 186 U. S. 320, 336.

Moreover, upon the second hearing before the Com-mission (January, 1912), Mr. Moore, the President of the Railway, testifying in its behalf upon the very point and from a full knowledge of the operations of the com-pany and its property and expense accounts, stated: "The revenue which we are now receiving for all kinds of service performed by the Manufacturers Railway Com-pany is sufficient to pay operating expenses, taxes, rentals, and other fixed charges and 7 per cent. on the investment."

The evidence produced by the Railway before the Dis-trict Court, while quite inconsistent with these conces-sions, is adduced as a mathematical demonstration that the $4.50 rate is confiscatory. The principal witnesses were an expert in the valuation of railways, two real estate experts, and Mr. Moore, the President of the Rail-way. Opinion evidence was relied upon, basing values on estimated cost of reproduction less depreciation, it being stated that the records of the Railway had been kept in such a way as not to show the actual cost. A table was presented ("Summary D") stating the entire value of the property of the Railway on January 1, 1915, at $2,215,353.78, and deductions were made of capital ex-penditures during the previous eighteen months, in order to show the value as of June 30, 1913, and June 30, 1914. It was attempted to assign to the interstate business a proportion of the total value corresponding to the extent

of its employment in that business. *Minnesota Rate Cases*, 230 U. S. 352, 461. The value of the property as of June 30, 1913, according to the estimates, was $2,086,474.98; and it being found that the interstate car movements during the preceding fiscal year were 79.58 per cent. of the total traffic, an application of this percentage to the total value gave $1,659,227.08 as the proportion of the value of the property, based on use, assigned to interstate traffic for the fiscal year 1913. Operating expenses, taxes, and rentals for the same year were said to amount to $195,628.80, of which 79.58 per cent., or $155,681.39, was apportioned to interstate business. The gross revenue from interstate business for the same year, on the assumed basis of $4.50 per car from all trunk lines on all car interchanges, was calculated to be $217,309.25. Deducting from this the apportioned expenses ($155,681.39) would leave a net revenue of $61,627.86, or only 3.7 per cent. of $1,659,227.08, the value of the property assigned on the basis of use to interstate traffic as of June 30, 1913. Similar processes showed apparent net earnings of only 1.86 per cent. for the fiscal year ending June 30, 1914, and .77 per cent. for the six months ending December 31, 1914.

The calculations are complex, and we need not reproduce them in detail. We have indicated the outlines, and will analyze the figures only far enough to show that they do not amount to a demonstration.

By way of contrast to the results deduced from opinion evidence concerning values, it should be remarked that Mr. Moore testified in the District Court that at the commencement of his connection with the company in February, 1909, he could only find an apparent book value amounting to $300,899.65, which he believed, however, did not reflect the value of the railway property at that time; and that down to January 31, 1915, there had been improvements and additions to the equip-

ment amounting to $560,008.75, and additions to real estate amounting to $525,349, making a total book value of $1,386,257.40. By deducting $128,878.80 for capital expenditures subsequent to June 30, 1913, we get $1,257,378.60 as the total value on that date, of which 79.58 per cent., or $1,000,621.89, would represent the value assigned to the interstate business according to the formula; and upon this amount the calculated net revenue of $61,627.86 would yield over 6 per cent.

Returning to the calculation relied upon by the Railway, Summary D includes an item "Present Value of Leases, $757,102."

This is the sum of two items, explained as follows: The Railway holds under lease from the Brewery all the lands occupied by its tracks and certain tracks owned by the Brewery within what is described as the "Brewery Zone," bounded by Lynch Street on the north, First Street on the east, Utah Street on the south, and Thirteenth Street on the west, the rental being $24,000 per annum, and the lease having seventeen years to run from January 1, 1915. The real estate experts valued this according to its area in square feet, and by this process arrived at $1,377,853 as its market value. The rental value on a 5 per cent. basis would be $68,892.65. Since by the terms of the lease the lessor was required to pay the taxes, estimated at about $6,000, reducing the net income to about $18,000, this sum was deducted from $68,892.65, leaving $50,892.65 as the annual value of the lease to the Railway for the unexpired term of seventeen years; and the cash value of an annuity of that amount for that term, said to be $573,767, was taken as the capital value of the lease.[1] Again, the Railway

---

[1] The process is clearly erroneous. Payment of taxes by lessor is for its own account, not for lessee's. Annual cost of leasehold to lessee is measured by gross rental paid, irrespective of what lessor does with the money.

holds certain property in its River Yard under lease from the City of St. Louis at an annual rental of $4,000, expiring October 7, 1934. This property was estimated by the witnesses to be worth $376,309, 5 per cent. of which is $18,815.45, and this amount less $4,000 was taken to be the annual value of the lease, which, capitalized for 19 years, 9 months and 7 days, the unexpired term from January 1, 1915 (date of valuation), gave $183,335 as the value of this lease to the lessee.

We are not convinced that these somewhat speculative valuations of the leaseholds, even if the calculations were otherwise correct, ought to be included in the value of the Railway's property for the present purpose.

The lease from the Brewery includes sidings, tracks, and yards some of which are of special value to the Brewery, but either are inaccessible to the general public served by the tracks of the Railway or are practically monopolized for plant use by the Brewery. The Commission, in its Second Report, 28 I. C. C. 96, described the conditions.[1] The original lease from the Brewery to

---

[1] The squares bounded by the streets Ninth, Thirteenth, Lynch, and Dorcas; Ninth, Eleventh, Pestalozzi, and Arsenal; and Second, Broadway (Broadway being just south of Seventh), Pestalozzi, and Arsenal are devoted to buildings and yards of the brewery exclusively. Although within these bounded areas there are also others in addition to the three following-named departments, they will, for the sake of convenience, be referred to as the bottling department, Budweiser department, and keg department, respectively. The tracks serving all three of these departments are in and between buildings and sheds of the brewery or in the yards adjoining, and are practically inclosed—on some sides by buildings with passageways between and on the other sides by fences or walls surrounding the yards contiguous to the buildings  All of the tracks within these yards are essential to the operation of the brewery except four team tracks in the yards contiguous to the bottling department at Ninth and Dorcas. As bearing upon the accessibility by the public to these various departments, it may be explained that the tracks in the open yard of the bottling department—that is, on the Ninth and Dorcas streets sides—are in-

the Railway, dated December 31, 1908, drew a distinction between tracks and sidings, leasing the former and excluding the latter, as to which, however, it contained this clause: "Said Association further gives and grants to said Railway the right and privilege to use and operate the aforesaid sidings, for railway purposes, upon condition, however, that such use will never interfere with the reasonable use thereof by said Association, of which said Association shall be the sole and only judge." This was made the subject of criticism at the first hearing before the Commission, and in consequence the lease was amended before the second hearing so as to omit this limitation (28 I. C. C. 97). But the evidence tends to show, if it does not render it clear, that certain yards and tracks representing more than one-third of the aggregate value of the leased lands are used almost if not quite exclusively by the Brewery; and raises a question whether some of the other yards, or portions of them, are not, like those mentioned, actually used rather as parts of the Brewery plant than as parts of the transportation system of the Railway.

---

closed by an iron fence, on which are displayed "No Thoroughfare" signs, and that the four public team tracks in this yard, referred to, end on the edge of an embankment supported by a concrete wall built up from Ninth street, which is some 10 or 12 feet below, and topped with an iron fence; that the tracks at the Thirteenth street side of this department are ended some 10 or 15 feet below the street level by a stone wall and must therefore be reached by entries from other sides; that the team tracks in the Budweiser yard at Ninth and Pestalozzi are inclosed by a high iron fence with swinging gates; and, likewise, that the 25 or more ladder tracks in the yards of the keg department, beginning at Second and Pestalozzi and running west to Broadway, are ended some 25 feet below the level of Broadway by an embankment which is reenforced by a concrete or stone wall topped with an iron fence. As access to the latter department from the Broadway side is thus absolutely impracticable, entrance must be effected from Pestalozzi street or between buildings of the brewery on the Arsenal street side between Second and Broadway.

The finding of the Commission that the Railway is for the purposes of its decision a ·common carrier (a finding not now in question), does not have the necessary effect, of impressing all of its property with the character of property employed in the service of the public. The Commission recognized that there was a question whether a part of the service performed by the Railway was not a plant-facility service rather than that of a common carrier. 21 I. C. C. 316.· And under the peculiar circumstances of the case we prefer to accept the reserved rental of $24,000, voluntarily fixed by the parties most concerned at a time antedating the present controversy, as more reliable evidence of the annual value of the rights conferred upon· the Railway as a carrier than the opinions of the experts based upon the theory that by the lease the entire value of the property was devoted to the public use.

The lease from the City to the Railway is not in the printed transcript, but the substance of the ordinance authorizing it is stated. It granted authority to construct, maintain, and operate tracks upon land of which a considerable part constituted a public wharf. If the stipulated rental is less than the fair annual value of the property it is to be presumed that the grant of the excess was to the public, not to the private interest of the Railway. We are at a loss to see upon what principle a presumed annual value of the leasehold in excess of the stipulated rent can be capitalized as assets of the Railway for the use of which in commerce the public is required to pay tolls. This would give to the lease the effect of converting public property, *pro tanto*, into private property.

Deducting the value of the leases, $757,102, from $2,086,-474.98, the estimated value of the Railway's property as of June 30, 1913, would leave $1,329,372.98, of which 79.58 per cent., or $1,057,915.02, would represent the value assigned to the interstate business according to the for-

mula; and upon this amount the calculated net revenue of $61,627.86, would yield over 5.8 per cent.

The calculations of revenue and expenses also require revision. The gross revenue from interstate business as stated includes not merely that derived from car interchanges at $4.50 per car, of which in the fiscal year ending June 30, 1913, there were 45,602 cars, producing $205,209; but in addition there were short-haul interchanges, 4,975 cars at the city rate of $2 per car, producing $9,950; inter-plant and intra-plant movements, 1,206 cars at $1 per car, producing $1,206; and weighing movements, 3,777 cars at 25 cents, producing $944.25, making a total of $217,309.25. The evidence renders it clear that the cost of these different movements is not and cannot be segregated; and Mr. Moore himself testified in effect that it costs the same to the Railway to weigh a car upon which 25 cents revenue is received, as to make an intra-plant switch of a car for which $1 is received, or a city movement limited by ordinance to $2, or an interchange delivery for which $4.50 is the rate assumed for the purposes of the test. The plant movements are for the benefit of the Brewery alone, that being the only industry having need for such service; weighing movements likewise appear to be independent of transportation in commerce. The limit of $2 fixed by the ordinance for the city movements seems to have been a part of the consideration for the grant to the Railway of rights in the streets; and on this theory any deficiency of revenue is properly apportionable to the traffic participating in these movements. But as to the other movements, the method of calculation adopted apportions the cost between the different classes according to the revenue derived from each, rather than according to the cost or value of the service.

If the plant and weighing movements—all of the former and three-fourths of the latter being performed for the Brewery—were charged at (say) $2.50 per car instead of the

rates voluntarily adopted, the gain of revenue would be more than $10,000—approximately 1 per cent. upon the entire $1,057,915.02.

The evidence submitted upon the issue of confiscation suggests other questions that need not be discussed or even mentioned; but we must not be understood as accepting what we have not particularly criticized. It is sufficient to say there is a failure to prove that the rate is unremunerative.

*Decrees affirmed.*

Mr. JUSTICE HOLMES took no part in the consideration or decision of these cases.