**NOBLE v. UNITED STATES et al.**

Civil No. 281.

District Court, D. Minnesota, Third Division.
July 22, 1942.

794

Charles A. Lethert, of St. Paul, Minn., and Frank H. Osterlind, of Minneapolis, Minn., for plaintiff.

Allen Crenshaw, of Washington, D. C. (Daniel W. Knowlton, Chief Counsel, of Washington, D. C., on the brief), for Interstate Commerce Commission.

S. R. Brittingham, Jr., Sp. Asst. Atty. Gen. (Thurman Arnold, Asst. Atty. Gen., and Mr. Victor E. Anderson, U. S. Atty., of St. Paul, Minn., on the brief), for the United States.

C. D. Todd, Jr., of Washington, D. C., for Contract Carrier Division of American Trucking Associations, Inc., intervenor.

Perry R. Moore, of Stinchfield, Mackall, Crounse & Moore, of Minneapolis, Minn., for Regular Common Carrier Conference of American Trucking Associations, Inc., Raymond Bros. Motor Transportation, Inc., Witte Transportation Co., and Steller Transportation Company, intervenors.

Franklin R. Overmyer, of Chicago, Ill., for Illinois-Minnesota Motor Carriers' Conference, and American Trucking Association, Regular Common Carriers' Conference.

Nicholson, Snyder, Chadwell & Fagerburg, of Chicago, Ill., for Kraft Cheese Co.

Before SANBORN, Circuit Judge, and NORDBYE and BELL, District Judges.

BELL, District Judge.

This is an action by John F. Noble, transacting business as the Noble Transit Company, to review and to annul certain restrictive provisions of an order of the Interstate Commerce Commission issued May 13, 1941, granting to the plaintiff a permit to operate as a contract carrier under the so-called "grandfather" clause of Section 209(a) of the Motor Carrier Act of 1935, as amended, 49 U.S.C.A. § 309(a). The cause was presented to a statutory court convened in accordance with the provisions of 28 U.S.C.A. §§ 41, 43 and 48. The plaintiff, defendants and intervenors were represented by counsel at the hearing when the evidence taken before the Commission was introduced, together with all orders made and entered by the Commission in the matter; and the case, on stipulation of the parties in open court, was submitted for final determination and decree.

The plaintiff began a motor carrier transportation business in September, 1934, when he obtained a common carrier permit from the state of Wisconsin for the transportation of general commodities between Chicago, St. Paul and Minneapolis. In November, 1934, he entered into a contract with Swift & Company for the carriage of merchandise for that company and

its affiliates in the trade territory of its South St. Paul packing plant which required him to operate between points in Minnesota, Wisconsin, Iowa, Illinois and North Dakota. Proper licenses and permits were issued by the various states for these operations. A similar contract was made by the plaintiff in February, 1935, with Libby, McNeil & Libby of Chicago and Blue Island, Illinois. Under these contracts the plaintiff carried merchandise for Swift and Libby, and under his common carrier permit he transported general commodities. The plaintiff June 1, 1935, made a contract with the Kraft Cheese Company for transportation of its products generally westward from Green Bay and Plymouth, Wisconsin, and northward from Chicago and Freeport, Illinois.

Subsequently to the dates mentioned the plaintiff claims to have made approximately 120 contracts with shippers for the transportation of property, more than 80 of which are still in existence. He has in operation 22 tractors, 22 trailers and 7 trucks. He has about 80 employees, and warehouse and terminal facilities in Minnesota, Wisconsin, Illinois and Iowa.

The plaintiff made timely application for a contract carrier permit. The findings of the Commission made by Division Five (28 M.C.C. 653) prescribe limitations that are the subject of this controversy. These findings provide:

"Findings.—We find that on July 1, 1935, and continuously since, applicant has been in bona fide operation as a contract carrier by motor vehicle in interstate or foreign commerce under individual contracts with persons (as defined in section 203(a) (1) of the act) who operate food canneries or meat-packing businesses, (a) of canned foods from Blue Island, Ill., to St. Paul, South St. Paul, Minneapolis, and Minnesota Transfer, Minn., and (b) of fresh meats, canned foods, dairy products, and packinghouse products and supplies, from South St. Paul to Grand Forks, N. Dak., Chicago and Rockford, Ill., and points in that portion of Wisconsin on and east of the Mississippi River from the intersection of the Wisconsin-Illinois-Iowa State lines near Dubuque, Iowa, to La Crosse, Wis., and U. S. Highway 53 from La Crosse to Cameron, Wis., and on and south of U. S. Highway 8, and (c) of the commodities described in (b) from Chicago to St. Paul, Minneapolis, South St. Paul, Winona, and Rochester, Minn., and La Crosse, Wis., over irregular routes; that applicant is entitled to a permit authorizing the continuance of such operations; and that in all other respects the application should be denied.

"Upon compliance by applicant with the requirements of sections 215 and 218 of the act, with our rules and regulations thereunder, and with M.C.C. 628, an appropriate permit will be issued. An order will be entered, denying the application, except to the extent a permit is granted herein."

The Commission has limited the plaintiff to the transportation of "fresh meats, canned foods, dairy products, and packing-house products and supplies" for "food canneries or meat-packing businesses" within a designated area. The order specifies the class of property that may be transported and the class of shippers that may be served. The plaintiff, while conceding that the Commission may specify the classes of property that may be carried, contends that the Commission is without authority under the law to restrict the permit to certain designated classes of shippers and challenges such limitations on the ground that they are unlawful, arbitrary and not sustained by the evidence. The defendants contend that the Commission has authority to specify not only the classes of property that may be carried but also the classes of shippers that may be served.

Therefore, the question presented is whether the Commission has statutory authority under the Motor Carrier Act to limit a contract carrier to the transportation of designated classes of property for specified classes of shippers.

With the development of the public highway system and the motor vehicle in the United States, the transportation of property by truck became a very considerable factor in the field of interstate commerce. The carrier by truck became a real competitor of the carrier by rail and water; consequently, Congress in 1935 added Part II, applicable to motor carriers, to the Interstate Commerce Act, 49 U.S.C.A. § 301 et seq. In 1940 Congress added the "National Transportation Policy."[1]

---

1 "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act (chapters 1, 8, and 12 of this title), so

The Interstate Commerce Act has been in the process of development for half a century. Long ago Congress recognized the imperative necessity of regulating the instrumentalities of commerce in the interest of the public welfare. It likewise recognized the impossibility of writing all the rules and regulations essential to effectuating its policy into statutory enactment; therefore, it embodied the foundation and ground-work in the Interstate Commerce Act, established the Interstate Commerce Commission and conferred upon it extensive powers to deal with the vast problems of transportation.

The Commission is authorized not only to administer the Act but also to interpret it, to hold hearings and to decide questions of fact of greatest importance. It is administrative and quasi-judicial in its functions, and is intended to have ample power to carry out the policy of Congress. Its decisions will not be disturbed by the courts unless they are unlawful or arbitrary, or unless a fair hearing was denied, or they are not supported by the evidence. It is composed of experts whose interpretations are entitled to great weight. United States v. American Trucking Associations, Inc., 310 U.S. 534, 539, 60 S.Ct. 1059, 84 L.Ed. 1345; Board of Trade of Kansas City v. United States, 314 U.S. 534, 546, 62 S.Ct. 366, 86 L.Ed. ——. The Court will not substitute its wisdom for that of the Commission. Manufacturers' Railway Company v. United States, 246 U.S. 457, 481, 38 S.Ct. 383, 62 L.Ed. 831; United States v. Carolina Freight Carriers Corporation, 62 S.Ct. 722, 730, 86 L.Ed. ——. In the Carolina Freight Carriers case the Court said: "We express no opinion on the scope of the certificate which should be granted in this case. That entails not only a weighing of evidence but the exercise of an expert judgment on the intricacies of the transportation problems which are involved. That function is reserved exclusively for the Commission. United States v. Maher, supra [307 U.S. 148, 59 S.Ct. 768, 83 L.Ed. 1162]; Alton R. Co. v. United States, supra [315 U.S. 15, 62 S.Ct. 432, 86 L.Ed. ——]. Our task ends if the statutory standards have been properly applied." In the Manufacturers Railway case [246 U.S. 457, 38 S.Ct. 389, 62 L.Ed. 831], the Court said: "Whether a preference or advantage or discrimination is undue or unreasonable or unjust is one of those questions of fact that have been confided by Congress to the judgment and discretion of the Commission * * *, and upon which its decisions, made the basis of administrative orders operating in futuro, are not to be disturbed by the courts except upon a showing that they are unsupported by evidence, were made without a hearing, exceed constitutional limits, or for some other reason amount to an abuse of power."

The Act itself defines the powers and duties of the Commission pertaining to the question with which we are concerned. We thus approach a consideration of the statutory authority of the Commission under the Act. Section 209(a)[2] of the Act denies the

---

administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act (chapters 1, 8, and 12 of this title) shall be administered and enforced with a view to carrying out the above declaration of policy." Act Sept. 18, 1940, § 1, 54 Stat. 899, 49 U.S.C.A. preceding section 301.

[2] "Sec. 209(a). No person shall engage in the business of a contract carrier by motor vehicle in interstate or foreign commerce on any public highway or within any reservation under the exclusive jurisdiction of the United States unless there is in force with respect to such carrier a permit issued by the Commission, authorizing such person to engage in such business: Provided, That, subject to section 210, if any such carrier or a predecessor in interest was in bona fide operation as a contract carrier by motor vehicle on July 1, 1935, over the route or routes or within the territory for which application is made and has so operated since that time, or, if engaged in furnishing seasonal service, only, was in bona fide operation on July 1, 1935, during the season ordinarily covered by its operations, except in either

right of a contract carrier to engage in business in interstate commerce within the jurisdiction of the United States without a permit by the Commission, and it specifies the conditions that entitle a carrier to a permit. Section 209(b)[3] outlines the procedure for acquiring the permit and what the permit shall contain. It requires the carrier to show that he is able to render the service of a contract carrier, that he is willing to conform to the law and the lawful requirements of the Commission, and that the proposed operation will be consistent with the public interest and the declared policy of Congress; it further provides that "the Commission shall specify in the permit the business of the contract carrier covered thereby and the scope thereof." Section 204(a) (2)[4] provides that it shall be the duty of the Commission to regulate contract carriers by motor vehicle. Section 204(a) (6)[5] provides that it is the duty of the Commission to administer, execute and enforce all the provisions of Part II of the Act. Section 203(a) (15)[6] defines a contract carrier, and Section 203 (a) (14)[7] defines a common carrier. In short, a contract carrier is one who engages

instance as to interruptions of service over which the applicant or its predecessor in interest had no control, the Commission shall issue such permit, without further proceedings, if application for such permit is made to the Commission as provided in paragraph (b) of this section and within one hundred and twenty days after this section shall take effect and if such carrier was registered on July 1, 1935, under any code of fair competition requiring registration, the fact of registration shall be evidence of bona fide operation to be considered in connection with the issuance of such permit. Otherwise the application for such permit shall be decided in accordance with the procedure provided for in paragraph (b) of this section and such permit shall be issued or denied accordingly. Pending determination of any such application the continuance of such operation shall be lawful. * * * "

[3] "Sec. 209(b). Applications for such permits shall be made to the Commission in writing, be verified under oath, and shall be in such form and contain such information and be accompanied by proof of service upon such interested parties as the Commission may, by regulations, require. Subject to section 210, a permit shall be issued to any qualified applicant therefor authorizing in whole or in part the operations covered by the application, if it appears from the applications or from any hearing held thereon, that the applicant is fit, willing, and able properly to perform the service of a contract carrier by motor vehicle, and to conform to the provisions of this part and the lawful requirements, rules, and regulations of the Commission thereunder, and that the proposed operation, to the extent authorized by the permit, will be consistent with the public interest and the policy declared in section 202 (a) of this part; otherwise such application shall be denied. The Commission shall specify in the permit the business of the contract carrier covered thereby and the scope thereof and shall attach to it, at the time of issuance, and from time to time thereafter, such reasonable terms, conditions, and limitations consistent with the character of the holder as a contract carrier as are necessary to carry out, with respect to the operations of such carrier, the requirements established by the Commission under section 204 (a) (2) and (6) : Provided, however, That no terms, conditions, or limitations shall restrict the right of the carrier to substitute or add contracts within the scope of the permit, or to add to his or its equipment and facilities, within the scope of the permit, as the development of the business and the demands of the public may require."

[4] "Sec. 204(a) (2). To regulate contract carriers by motor vehicle as provided in this part, and to that end the Commission may establish reasonable requirements with respect to uniform systems of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operation and equipment."

[5] "Sec. 204(a) (6). To administer, execute, and enforce all other provisions of this part, to make all necessary orders in connection therewith, and to prescribe rules, regulations, and procedure for such administration."

[6] "Sec. 203(a) (15). The term 'contract carrier by motor vehicle' means any person, not included under paragraph (14) of this section, who or which, under special and individual contracts or agreements, and whether directly or by a lease or any other arrangement, transports passengers or property in interstate or foreign commerce by motor vehicle for compensation."

[7] "Sec. 203(a) (14). The term 'common carrier by motor vehicle' means any person who or which undertakes, whether directly or by a lease or any other arrangement, to transport passengers or property, or any class or classes of property, for the general public in interstate

798

in the transportation of property under individual contracts and is other than a common carrier.

 Authority is expressly vested in the Commission, as we have observed, to "specify in the permit the business of the contract carrier covered thereby and the scope thereof." This is a significant provision of the Act and its interpretation is decisive of the principal issue in this case. The permit constitutes the carrier's authority to do business and the specifications in the permit fix the limitations of the business; it may range from very limited to very extensive operations. The Act does not stop with conferring power to specify the business; it expressly adds the power to specify the scope of the business. There was a purpose in this additional provision. Manifestly, the intention was to vest in the Commission broad powers to determine and to specify in the permit, by the use of adequate language to do so, the extent of the operations in which the carrier might engage. The word "scope" is a comprehensive term as used in the Act and is for the purpose of enabling the Commission to prescribe a limited or an extensive range of operations in accordance with the rights of the carrier as determined by the character and extent of the service furnished on July 1, 1935. The Commission has ample authority under the Act to designate the classes of shippers that may be served in addition to the classes of property that may be transported, in specifying the business and the scope thereof, if it is necessary or convenient to do so. The business of the shipper may be described in the permit if it thus can be made more accurately to define the limitations of the business of the carrier. The language of the Act is plain and simple. An application for a permit could be made under the grandfather clause, a hearing held and the facts determined by the Commission. Authority was vested in the Commission to determine the character and extent of the service on the crucial date and to issue a permit in accordance therewith; and the power to specify the scope of the business meant the authority to define the extent of the operations that might be conducted under it. This means that the Commission could select the language and the method of specifying the scope of the business. Unless the Commission has such authority it cannot carry out the announced policy of Congress.

The Commission has been confronted with the question now before us. T. B. Longshore, Contract Carrier Application, 2 M.C.C. 480; Keystone Transportation Company, Contract Carrier Application, 19 M.C.C. 475; John F. Noble, Contract Carrier Application, 28 M.C.C. 653, the case under consideration. The argument has been made that the Commission in the Keystone case took a position inconsistent with its decision in the Longshore case, and that in this case it has followed the Keystone decision. In its report in this case the Commission said: "The question of the form of authority to be granted to contract carriers of retail food store commodities was considered at length in Keystone Transp. Co. Contract Carrier Application, 19 M.C.C. 475, and the same problem with respect to defining the business of applicant and the scope thereof is here presented. In granting authority herein, we shall accordingly adopt the general form of authority used in the cited case with appropriate modifications."

In the Longshore case the carrier applied for a permit to transport steel products. Protestants agreed to withdraw opposition to the application on condition that the service of the applicant be limited to a designated company, the only one applicant had been serving. The Commission refused to name the company in the permit on the ground that it would prevent the addition or substitution of contracts as provided by law. The phrases "within the scope of the permit" were construed by the Commission to relate to the routes or territory which the carriers served and to the commodities which it was authorized to transport and not to the shipper. Obviously, the facts in that case were such as not to require a specification of the class of shippers, as a permit without such limitation would not enable the carrier under the circumstances to extend his operations to the transportation of general commodities for a large number of shippers.

In the Keystone case application was made to serve a chain wholesale and retail grocery and food business engaged in deal-

---

or foreign commerce by motor vehicle for compensation, whether over regular or irregular routes, including such motor vehicle operations of carriers by rail or water, and of express or forwarding companies, except to the extent that these operations are subject to the provisions of part I."

ing in a great variety of commodities. The services of the carrier had been integrated with the business of the shipper so that it was rendering a highly specialized form of service. The appellant sought to have its business specified in terms of commodities, as in the Longshore case, but the Commission refused for the reason that merely naming the commodities that the carrier had been transporting in fact would impose no limitations whatever; consequently, the Commission found it necessary for effective regulation, in addition to specifying the commodities, to designate the class of shippers that might be served.

The inherent nature of the business in the Longshore case constituted an effective restriction, while the same specification in the business in the Keystone case as that adopted in the Longshore case would have permitted the carrier to engage in the transportation of general commodities for all shippers. While the specification of the business in the Longshore case was suitable under the facts in that case, it did not meet the requirements of the Keystone case. In the Longshore case the Commission went as far as it needed to go under the circumstances while in the Keystone case it was required to impose an additional limitation to avoid authorizing the transportation of general commodities for all shippers. In the instant case the Commission undoubtedly followed its decision in the Keystone case because of the similarity of facts.

The plaintiff has not been injured by the interpretation of the Commission. On the crucial date, he had a contract with Swift, a meat-packing business, and with Libby, a food-canning business. On that date he had no other contracts under which he was engaged in actual operations. The plaintiff may continue operations under these contracts, and he may substitute or add other contracts for the transportation of similar property for food canners and meat packers in the territorial area covered by him on the crucial date. He can carry the classes of commodities specified for any food cannery or for any meat-packing business in the area. If the plaintiff can show that the public interest would be served by his operation as a contract carrier in other fields, he can obtain a permit for such operations. The defendants contend that the plaintiff, under the grandfather clause and without proof of need of new operations, is seeking to extend his business beyond

any rights intended to be conferred by the law. In a large measure this is true because of the great variety of products the plaintiff was carrying for Swift and for Libby. If the plaintiff is not limited to serving the classes of shippers with whom he had contracts on the crucial date, he could engage in the transportation of an extensive list of goods, wares and merchandise for all shippers. The theory of the plaintiff may be illustrated, as follows: He hauled some paints, some articles of clothing and some hardware for Swift on the crucial date; therefore, he now has the right to haul paint for any paint manufacturer, clothing for any clothing merchant and hardware for any hardware dealer. Such elasticity is not contained in the grandfather clause and such a construction would prevent effective regulation of the transportation industry.

■ When the Motor Carrier Act was under consideration, Congress obviously recognized that motor carriers throughout the country were serving shippers under individual contracts and were equipped in many instances to render a specialized service, and that the continuance of such arrangements was desirable for the benefit of both carriers and shippers; so, the grandfather clause was included in the Act. It was a saving clause designed to save to the contracting parties the carrier service then existing. The Act prescribes the conditions under which the carrier may substitute or add contracts or add to his equipment and facilities. It must be when the proposed operation "will be consistent with the public interest" as provided by Section 209(b), or "within the scope of the permit" in accordance with the proviso which closes that section. The function of the Commission to determine the scope of the business is not limited by this proviso; indeed, it adds to the certainty of such power.

The briefs in this case contain extensive discussions of the rights of contract carriers versus common carriers. There should be no discrimination between carriers; one class should not receive special privileges in preference to another; one should not be allowed to profit at the expense of another; all should receive equal protection under the law and equal consideration in the process of regulation; and this very problem of fixing, maintaining and administering equal justice to all carriers is one of the chief objectives of the Interstate

800

Commerce Act. Naturally, there is a clash when business interests come into competition; then the supervision and the authority of the Commission becomes useful. The welfare of the common carrier interests becomes involved in controversies such as this at the point where the Commission is required to consider the effect of its action on the transportation system as a whole. In the administration of the law, constant consideration must be given to the effect of every act of the Commission on all shippers and carriers. Accurate interpretation and effective regulation can result only from a broad perspective of the whole plan of carrier regulation and not from a view of the effect on affairs of one shipper or carrier.

 A question is presented as to the validity of the claims based on the written contract made by the plaintiff on June 1, 1935, with the Kraft Company to transport its products. Operations were commenced under this contract in March, 1936, westbound from certain points in Wisconsin and northbound from Chicago. Extensions of this service later were made to other points in Wisconsin, Minnesota and North Dakota. The Commission held that this was an unauthorized extension of service commenced after the grandfather date and was not within the scope of the permit. Section 209(a) of the Act provides that an applicant is entitled to a permit covering operations on or before July 1, 1935, "if * * * such carrier * * * was in bona fide operation" on that date and "has so operated since that time." Undoubtedly,

the statute contemplated actual operations on the crucial date and the grandfather rights are measured by the character and extent of the service then being rendered.[8] Actual and substantial, rather than potential service, is essential under the law.[9] The proviso confers a special privilege and extends only to carriers plainly within its terms.[10] The execution of the written contract with Kraft is evidence of an intention to begin service, but it was nearly eight months before operations under it were commenced and that does not meet the requirements of the statute. If there had been any intention to recognize merely the existence of a contract as a basis for a permit Congress undoubtedly would have so provided. The decision of the Commission on this question must be sustained.

 The validity of the order of the Commission designating territorial limits depends on whether it is supported by substantial evidence. The statute recognizes the right to a permit "over the route or routes or within the territory" for which application is made. The Commission is authorized to determine the area.[11] This is a question of fact and no showing has been made that the finding of the Commission is not sustained by the evidence.

We conclude that there was a fair hearing in this matter, that the findings of fact are supported by substantial evidence, and that the decision of the Commission is lawful and not arbitrary. Findings of fact, conclusions of law and an order for judgment will be made and entered accordingly.

[8] Alton Railroad Company v. United States, 315 U.S. 15, 62 S.Ct. 432, 86 L. Ed. —; United States v. Maher, 307 U. S. 148, 59 S.Ct. 768, 83 L.Ed. 1162; United States v. Rosenblum Truck Lines, Inc., 315 U.S. 50, 62 S.Ct. 445, 86 L.Ed. —.

[9] McDonald v. Thompson, 305 U.S. 263; United States v. Carolina Freight

Carriers Corporation, 315 U.S. 475, 62 S.Ct. 722, 86 L.Ed. —.

[10] Gregg Cartage and Storage Company v. United States, 62 S.Ct. 932, 86 L. Ed. —.

[11] Howard Hall Company, Inc., v. United States, 62 S.Ct. 732, 86 L.Ed. —; United States v. Carolina Freight Carriers Corporation, 62 S.Ct. 722, 86 L. Ed. —.