816 F.2d 1366
 ARIZONA ELECTRIC POWER COOPERATIVE, INC., Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
The Atchison, Topeka and Santa Fe Railway Company and
Southern Pacific Transportation Company,
Intervenors-Respondents.
 No. 86-7233.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 12, 1987.
Decided May 8, 1987.
As Amended June 25, 1987.
 
 William L. Slover, C. Michael Loftus, Donald G. Avery, Kelvin J. Dowd, Robert D. Rosenberg, Pauline E. Waschek, Washington, D.C., for petitioner.
 Ellen D. Hanson, Cecelia E. Higgins, Washington, D.C., for respondent.
 R. Eden Martin, Lee M. Straus, Robert M. Portman, David M. Levy, Washington, D.C., for intervenors-respondents.
 Petition for Review of an Order of the Interstate Commerce Commission.
 Before NOONAN, and O'SCANNLAIN, Circuit Judges, and STOTLER,* District Judge.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 Perhaps inspired by Jarndyce v. Jarndyce, the fabled interminable litigation of Dickens' Bleak House, the Interstate Commerce Commission has been presiding over this continuing saga for the last ten years, now in its sixth epoch.
 
 
 2
 Piercing the musty veil of regulatory sophistry surrounding this proceeding, we see that the Commission had a simple task: to determine the reasonableness of the rate intervenor-respondents charged petitioner for hauling coal in unit trains between 1977 and 1982. Petitioner originally sought such determination in 1977 before the first shipment. We thought the guidelines were clear enough when we had this same matter before us in 1982 and 1983. Because we find that petitioner has suffered the arcane rigors of the regulatory process long enough, we vacate, remand, and retain jurisdiction to assure that our mandate is promptly implemented.
 
 FACTS AND PROCEEDINGS BELOW
 
 3
 Petitioner Arizona Electric Power Cooperative, Inc. ("AEPCO") is a nonprofit rural electric power cooperative that produces and distributes electric power throughout Arizona and parts of California. In 1974 AEPCO began construction on two 175 megawatt coal-fired generating plants near Cochise, Arizona and signed a long term fuel supply contract with a coal mine near Gallup, New Mexico. AEPCO needed to ship the coal the 523 miles from New Mexico to Arizona by rail, but by the time the plants were scheduled to go on line, the cooperative had not been able to negotiate a favorable rail transportation rate with either the Atchison, Topeka & Santa Fe Railway Company ("Santa Fe") or the Southern Pacific Transportation Company ("Southern Pacific") (together referred to as "Railroads"), the only available carriers.[1]
 
 
 4
 In 1977 AEPCO filed a complaint with the Interstate Commerce Commission ("ICC" or "Commission") under 49 U.S.C. Sec. 11701 of the Interstate Commerce Act ("Act"), requesting the Commission to set a maximum rate for its coal traffic at $4.67 per ton. The Railroads' offered rate at that time was $8.64 per ton. The Railroads requested that the ICC categorize their rate as a "capital incentive rate" to be protected under 49 U.S.C. Sec. 10729.[2] Section 10729 provided an expedited alternative to normal rate filing procedures and prohibited the Commission from suspending or setting aside the rate for five years. The ICC approved the $8.64 rate under section 10729 in November 1977, and the protected rate went into effect on January 1, 1978. Incentive Rate on Coal--Gallup, New Mexico to Cochise, Arizona, 357 I.C.C. 683 (1977) ("AEPCO I "), aff'd, Houston Lighting & Power Company and Arizona Electric Power Cooperative, Inc. v. United States, 606 F.2d 1131 (D.C.Cir.1979), cert. denied, 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980).
 
 
 5
 After the ICC issued its decision in AEPCO I, the Railroads raised AEPCO's rate several times, and by 1980 the rate stood at $12.30 per ton. AEPCO challenged these increases by filing another section 11701 complaint with the ICC. While this action was pending, Congress repealed the capital incentive rate protection afforded by section 10729 with the passage of section 210 of the Staggers Rail Act of 1980, Pub.L. 96-448, 94 Stat. 1910 ("Staggers Act"). Section 210(b) of the Staggers Act contained a savings clause that protected the Railroads' existing capital incentive rates for the five years originally guaranteed.[3]
 
 
 6
 In August 1981 the Administrative Law Judge ("ALJ") hearing AEPCO's complaint decided that the section 10729 and Staggers Act protection applied only to the original rate established and not to subsequent increases. Consistent with that interpretation, the ALJ reviewed the reasonableness of AEPCO's rate increases and concluded that the maximum reasonable rate at that time was $10.88 per ton. As a result, the ALJ ordered the Railroads to pay refunds to AEPCO. ICC Case No. 37437 (Decision Served August 21, 1981) ("AEPCO II ").
 
 
 7
 The Railroads appealed AEPCO II to the full Commission and in March 1982 the ICC reversed the order of the Administrative Law Judge, dismissing the complaint. ICC Case No. 37437 (Decision Served March 30, 1982) ("AEPCO III "). The Commission believed that the capital incentive rate established by section 10729 and extended by the Staggers Act immunized both the base rate and any cost recovery increases applied to that rate.
 
 
 8
 AEPCO appealed the Commission's decision to this court in 1982 (Docket No. 82-7283). AEPCO filed its brief in September, but the Commission requested and received two extensions of time in which to file its brief. Finally, in November 1982, the Commission made a motion to remand the case for further proceedings, stating that "[t]he Commission has determined that the decision is in material error. The present appeal may be rendered moot by the final determination by the Commission on this matter" (Motion of November 8, 1982).
 
 
 9
 In an order dated November 19, 1982 we remanded the case to the ICC for two months to allow it to reconsider its decision. Two days before the remand deadline expired the Commission requested an indefinite removal of the time limit. We denied that request and gave the Commission three weeks to file a brief or concede that section 10729 did not immunize rate increases from review (Order of March 31, 1983). In April 1983 the Commission filed a concession statement with the court, "explicitly conceding that the Interstate Commerce Commission is not precluded by former 49 U.S.C. 10729 from reviewing the coal rates challenged by petitioner, to the extent the initial rate has been increased by later general rate increases" (Statement of April 20, 1983). We then remanded the case to the ICC with instructions that review be "completed forthwith" (Order of May 11, 1983).
 
 
 10
 In August 1983 the Commission issued its new decision. ICC Case No. 37437 (Decision Served August 30, 1983) ("AEPCO IV "). The Commission reiterated the substance of the statement it made to this court by concluding that "the protection of section 210(b) of the Staggers Act extends only to the capital incentive rate approved specifically under former section 10729 and not to the rate as subsequently increased by general rate and fuel cost increases...." AEPCO IV at 6. The Commission noted that inflation recovery was not a sufficient basis to immunize the rate increases from challenge. So noting, however, the Commission went on to state that it "need not, and shall not find unreasonable any rate resulting from the imposition of cost-based general increases (including inflation) so long as carrier's revenue/cost ratio is not increased." Id.
 
 
 11
 AEPCO petitioned the ICC to reconsider, but in April 1986 the Commission denied that request and reaffirmed the policy announced in AEPCO IV. According to the Commission, the legislative intent of the Staggers Act would have been thwarted if the ICC "failed to provide for cost recovery and allowed inflation to erode the base capital incentive rate." ICC Case No. 37437 (Decision Served April 10, 1986, p. 3) ("AEPCO V ").
 
 
 12
 AEPCO timely appealed the AEPCO V decision to this court.
 
 STANDARD OF REVIEW
 
 13
 The standard of review for a decision of the ICC is defined in the Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(A) (1982). A reviewing court may hold unlawful agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. The scope of this review is narrow. Bowman Transportation Co. v. Arkansas Best Freight System, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974). ICC decisions in rate cases "are not to be disturbed by the courts except upon a showing that they are unsupported by evidence, were made without a hearing, exceed constitutional limits, or for some other reason amount to an abuse of power." Atchison, Topeka & Santa Fe Railway Company v. Wichita Board of Trade, 412 U.S. 800, 806, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973) (quoting Manufacturers R. Co. v. United States, 246 U.S. 457, 481, 38 S.Ct. 383, 389, 62 L.Ed. 831 (1918)).
 
 DISCUSSION
 
 14
 A. Finality of the AEPCO V Decision.
 
 
 15
 After this appeal was filed the ICC and the United States moved to dismiss the case on the ground that AEPCO V was not a final decision. This court denied the motion in an order filed November 14, 1986. In their briefs on the merits, the ICC and the intervenor Railroads again challenge the jurisdiction of this court to review the AEPCO V decision.
 
 
 16
 The denial by a motions panel of a motion to dismiss on jurisdictional grounds does not foreclose a merits panel from reconsidering the jurisdictional issue. United States v. Humphries, 636 F.2d 1172, 1174 n. 2 (9th Cir.1980),cert. denied, 451 U.S. 988, 101 S.Ct. 2324, 68 L.Ed.2d 846 (1981). A party may raise jurisdictional challenges at any time during the proceedings. May Department Store v. Graphic Process Co., 637 F.2d 1211, 1216 (9th Cir.1980).
 
 
 17
 "An issue is fit for judicial review if it is essentially legal and if the agency's resolution of it is final." Consolidated Rail Corp. v. United States, 812 F.2d 1444, 1451 (3d Cir.1987). In Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967) (FDC labeling regulations held reviewable prior to any government enforcement action), the Supreme Court noted that "[t]he cases dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic way." The Abbott Court went on to review, and approve, a "flexible view of finality." Id. at 150, 87 S.Ct. at 1516. See, e.g., United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956) (FCC policy announcement refusing to issue television licenses to certain applicants held reviewable as final action); Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910 (1956) (ICC order specifying commodities to be treated under statutory class of "agricultural commodities" held reviewable); Columbia Broadcasting System v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942) (FCC regulation concerning prospective contractual arrangements for broadcasters held reviewable); cf. Federal Trade Commission v. Standard Oil Co., 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980) (FTC issuance of a complaint alone not judicially reviewable).
 
 
 18
 The ICC argues that AEPCO V is not a final decision because the AEPCO rate case is an ongoing administrative proceeding. The Railroads also suggest that AEPCO V may be rendered moot by recent evidence concerning carrier competition that challenges ICC's rate jurisdiction in the case.
 
 
 19
 The ICC and the Railroads fail to distinguish, however, between the rate increases at issue in this appeal and the rate issues presented in the ongoing AEPCO proceeding. This appeal only concerns the ICC's refusal to review AEPCO's rate increases during the five year period of Railroad protection that began in 1977. In AEPCO III, AEPCO IV, and AEPCO V the ICC clearly expressed its policy concerning AEPCO's rate increases during that five year Railroad protection period. The fact that AEPCO continues to challenge the rate from November 1982 onward does not affect the reviewability of the ICC's decision in AEPCO V.
 
 
 20
 The motions panel was correct to find that AEPCO V "establishes a policy and methodology that is sufficiently final to support review under the principles of Abbott Laboratories v. Gardner " (Order of November 14, 1986). We have a legal issue before us and we have jurisdiction under 28 U.S.C. Secs. 2321(a), 2342(5).
 
 
 21
 B. Merits of the AEPCO V Decision.
 
 
 22
 The ICC admits that the effect of AEPCO V was to reach through a policy decision a result the Commission was prevented from reaching in its prior legal interpretations. The Commission finds authority for this new approach in its broad discretionary powers. AEPCO, on the other hand, argues that the ICC abused its discretion by (1) contradicting its earlier representations to this court; (2) establishing a rate standard that conflicts with the general Coal Rate Guidelines and prior ICC decisions; and (3) misinterpreting the legislative intent of section 10729 and the Staggers Act. AEPCO's claims are discussed in turn below.
 
 
 23
 1. The ICC's Earlier Representations to This Court
 
 
 24
 When the ICC requested a voluntary remand from this court in 1982-83, it made several representations to the panel. First, the Commission stated that it had "determined that the [AEPCO III ] decision is in material error" (Motion of November 8, 1982). Second, the Commission indicated that it needed time to finalize its coal rate guidelines "so that this rate not be judged in a manner inconsistent with all other pending rate cases" (Motion of January 17, 1983).[4] Finally, the Commission "explicitly conced[ed] that the Interstate Commerce Commission is not precluded by former 49 U.S.C. 10729 from reviewing the coal rates challenged by petitioner, to the extent the initial rate has been increased by later general rate increases" (Statement of April 20, 1983). Only after this final concession was made did we remand the proceeding to the agency (see Order of May 11, 1983).
 
 
 25
 As to the ICC's first representation, the Commission claims it corrected the material error of AEPCO III by affirming the ALJ, in part, in AEPCO IV: "[o]n reconsideration, we find that the ALJ's decision was correct in concluding that the rate [increase] was not immune from a reasonableness complaint under 49 U.S.C. 10729." AEPCO IV at 3. But the Commission in AEPCO IV then went on to state that it "need not, and shall not find unreasonable" any rate increases based on cost recovery or inflation. AEPCO IV at 6. AEPCO asserts that this purported correction of material error only creates an illusion of access to the regulatory review process. We agree.
 
 
 26
 Referring to its second representation before this court, the Commission in AEPCO V claimed it "did not represent to the court that we would apply the same standard here that we apply to all coal rate proceedings." AEPCO V at 2. Instead, the Commission created a new standard by announcing that it would "apply the rate standards in Ex Parte No. 347 (Sub-No. 1) [the general Coal Rate Guidelines] to this proceeding to the extent that the rate as increased exceeds the described cost recovery level " (id. at 3) (emphasis added).
 
 
 27
 Contrary to the Commission's statements in AEPCO V, the ICC clearly did represent to this court in 1983 that it intended to apply its developing Coal Rate Guidelines when it stated:
 
 
 28
 To correct its earlier error in this proceeding, the Commission has reopened the case. Since the increased rate is not immune, the Commission obviously must address the rate reasonableness issue, but as noted in our petition for modification, the Commission is not presently able to assess the reasonableness of this increased rate because the Commission has rejected the ton/ton-mile maximum rate standard applied by the Administrative Law Judge in this proceeding, and has not finally determined an appropriate standard to apply. (However, since the time we filed our earlier petition for modification, the Commission has issued and sought comments on proposed guidelines for assessing the reasonableness of coal rates generally. Ex Parte No. 347 (Sub-No. 1), Coal Rate Guidelines Nationwide, served February 24, 1983).
 
 
 29
 (Statement of April 20, 1983.) We made reference to those guidelines in our remand order, encouraging the Commission to apply its "new economic methodology" (Order of May 11, 1983). As the Commission now admits, the cost recovery standard articulated in AEPCO IV and AEPCO V goes beyond the general Coal Rate Guidelines and has never been applied in any other coal rate case.
 
 
 30
 The Commission's final representation to this court--that section 10729 does not preclude review of rate increases--was not made voluntarily. It was, in fact, copied verbatim from the language in our Order of March 31, 1983. That order gave the Commission three weeks to either file a brief or file a statement of concession concerning the interpretation of section 10729. The Commission's concession statement was required as a precondition to voluntary remand.
 
 
 31
 The Commission reiterated its concession in response to the intervenor Railroads' opposition to remand in 1983: "[t]he Commission has specifically cited material error as the basis for its voluntary remand. More specifically, it has explicitly conceded that it is not precluded by former Section 10729 from reviewing the rates challenged, to the extent the initial rate has been increased by later general rate increases" (ICC Response Statement of May 16, 1983).
 
 
 32
 The ICC's statement of concession to this court seemed unequivocal on its face, but in AEPCO V the Commission revisited the conclusions it reached in AEPCO III. In AEPCO III the Commission relied on the plain meaning of section 10729 and the Staggers Act to conclude that AEPCO's rate increases were protected from review. Although the Commission disavowed that interpretation in its statements before this court and in AEPCO IV, the Commission reached the same result in AEPCO V by relying on the "legislative history," rather than the plain meaning, of the Staggers Act.
 
 
 33
 The Department of Justice ("Department") acknowledges that "the Commission's [AEPCO V ] decision can be viewed as being inconsistent with representations previously made to this Court" (Position Statement of the United States at 2-3). The Department nonetheless supports the AEPCO V decision "as a matter of administrative discretion." Id. As the Department notes, however, the Commission may exercise its administrative discretion only if its interpretation of the statute is lawful.
 
 
 34
 This court specifically conditioned its remand to the ICC in 1983 on the Commission's confession of "material error" and concession that it was not precluded by section 10729 from reviewing AEPCO's rate increases. Although the general rule is that an agency is free on remand to reach the same result by applying different rationale, SEC v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the agency "must cogently explain why it has exercised its discretion in a given manner." Motor Vehicle Mfrs. Ass'n v. State Farm Mutual, 463 U.S. 29, 48, 103 S.Ct. 2856, 2869, 77 L.Ed.2d 443 (1983).
 
 
 35
 To the extent that the Commission in AEPCO IV and AEPCO V relied on the same rationale that it disavowed before this court in 1983, we conclude that it has abused its administrative discretion and violated the condition of the remand.
 
 
 36
 2. The General Coal Rate Guidelines and Prior ICC Decisions
 
 
 37
 AEPCO claims that the maximum rate standard proposed by the ICC in AEPCO V conflicts with the general Coal Rate Guidelines and the Commission's prior decisions. The ICC's response is that there is no inconsistency because its prior decisions do not prohibit it from exercising its discretion in a different manner.
 
 
 38
 The ICC does not dispute AEPCO's assertion that the Coal Rate Guidelines were intended to be applied to all noncompetitive rate cases. In fact, the Commission maintains that it will apply the Guidelines to AEPCO's rate, "except for the portions protected under Section 210(b) and the Commission's own five-year capital incentive rate protection policy" (Respondent's Br. at 24). The Commission apparently refuses to admit that its "exception" creates a rate standard completely different from the Guidelines.
 
 
 39
 The Commission does admit that no other coal rate case is being judged like AEPCO's, but it defends this on the ground that AEPCO is the only remaining capital incentive rate case in litigation. The three similar cases that the Commission refers to, however, were all decided differently than AEPCO V. See Incentive Rate on Coal--Cordero, Wyoming to Smithers Lake, Texas, 358 I.C.C. 537 (1977) ("Smithers Lake "), aff'd sub nom., Houston Lighting & Power Co. v. United States, 606 F.2d 1131 (D.C.Cir.1979); Incentive Rates on Coal--Axial, CO to Coleto Creek, TX, 362 I.C.C. 572 (1980) ("Coleto Creek "), remanded sub nom., Central Power & Light Co. v. United States, 634 F.2d 137 (5th Cir.1980),cert. denied, 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 108 (1981); Ex Parte No. 327, Rate Incentives for Capital Investment, 353 I.C.C. 760 (1977) ("Ex Parte No. 327 "). Smithers Lake, Coleto Creek, and Ex Parte No. 327 all held that cost recovery based rate increases were not protected from ICC review. The Commission specifically cited these cases in defense of its request for a remand in 1983:
 
 
 40
 Intervenors argue that the increases to the rate are also protected by former Section 10729. However, such an expansive reading of former Section 10729 has been firmly rejected. In Ex Parte No. 327, Rate Incentives for Capital Investment, 353 I.C.C. 760, 781 (1977), the Commission clarified its position that "[former Section 10729] does not, however, impair the rights of interested parties and the Commission under [Section 10707] to cause proposed changed rates to be investigated and suspended. To the extent changed, capital incentive rates may be found unlawful during the 5-year period,...." [emphasis added by the ICC].
 
 
 41
 (ICC Response Statement of May 16, 1983.) The Commission referred to Smithers Lake and Coleto Creek in the same passage as "consistent with this reading of Ex Parte No. 327." Id.
 
 
 42
 The Commission did not analyze these cases in AEPCO IV or AEPCO V, except to acknowledge that the ALJ's decision in AEPCO II was consistent with Ex Parte No. 327. AEPCO IV at 4. In its brief, the Commission distinguishes these cases simply by stating that it is not bound by them: "[t]here is no inconsistency in the instant decision [AEPCO V ], in which the Commission announced that, although it could set aside inflation-based rate increases as unreasonable, as a discretionary matter it does not intend to do so" (Respondent's Br. at 24) (emphasis in original).
 
 
 43
 The prior decisions of an agency "generally provide a guide to action that the agency may be expected to take in future cases." Atchison, Topeka & Santa Fe Railway Company v. Wichita Board of Trade, 412 U.S. 800, 807, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973) (quoting NLRB v. Wyman-Gordon Co., 394 U.S. 759, 765-66, 89 S.Ct. 1426, 1429-30, 22 L.Ed.2d 709 (1969)). Although an agency may depart from its prior norms, when it does "the departure ... must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate." Id. 412 U.S. at 808, 93 S.Ct. at 2375. The ICC's exclusive reliance on its broad discretionary power does not provide an adequate basis to support its otherwise arbitrary treatment of the AEPCO rate case.
 
 
 44
 3. Interpretation of the Applicable Statutes
 
 
 45
 In AEPCO III, the ICC relied on the plain language of section 10729 and section 210(b) of the Staggers Act to extend capital incentive rate protection to subsequent rate increases. The Commission later conceded to this court that its statutory interpretation was in error (Statement of April 20, 1983). The Commission reiterated its concession in AEPCO IV : "[w]e find that the 5-year protection accorded by former section 49 U.S.C. 10729 applies only to the originally established capital incentive rate." AEPCO IV at 1. Nonetheless, the Commission declared in AEPCO IV that it would continue to extend protection to AEPCO's rate increases, although the Commission failed to explain the basis for its decision.[5] In AEPCO V, the Commission made a belated attempt to find support for its position, stating that "[t]he legislative history of section 210 shows that these protections were designed to create stability to promote large investments. See H.R.Rep. 1430, 96th Cong., 2d Sess. 101 (1980)." AEPCO V at 3.
 
 
 46
 As the ICC conceded to this court nearly four years ago, the plain meaning of section 10729 and section 210(b) taken together clearly limits statutory protection to the original rate; it does not extend protection to later rate increases. The Commission's passing reference to House Report 1430 fails to provide any further support.[6] The ALJ in AEPCO II correctly noted: "[n]othing in section 10729 or ... the legislative history preclude the capital incentive rate as increased from attack" AEPCO II at 2; "There is no evidence on the face of section 210(b) or in the legislative history of any intent to broaden the scope of the immunity beyond that provided." Id. at 6. Commissioner Lamboley, dissenting in AEPCO V, was also correct in his assessment:
 
 
 47
 Quite simply, when Congress intends that revenue to variable cost ratio (R/VC) is to be a determining characteristic it choose [sic] the appropriate and specific language. See, e.g. various provisions of Sections 10701a, 10707a, 10709, and 10731. Here Congress used the term "rate," and not "revenue to variable cost ratio." Moreover, the Legislative History does not support a construction of Section 10729 that equates the term "R/VC ratio" with "rate" as customarily used. Cf. Sections 10102(17) and 10709.
 
 
 48
 AEPCO V at 5.
 
 
 49
 The most basic canons of statutory construction would have to be strained beyond recognition for us to find for the Commission in this case. It is fundamental that the words of a statute are to be given their ordinary, plain meaning unless it is clear that some other meaning was intended. Malat v. Riddell, 383 U.S. 569, 571, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966); Pena-Cabanillas v. United States, 394 F.2d 785, 789 (9th Cir.1968). When Congress includes a specific term in one section of a statute but omits it in another section of the same Act, it should not be implied where it is excluded. Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983); Pena-Cabanillas, 394 F.2d at 789. Moreover, an analysis of legislative history is proper only to solve, not to create an ambiguity. Hamilton v. Rathbone, 175 U.S. 414, 421, 20 S.Ct. 155, 158, 44 L.Ed. 219 (1899), accord, Blum v. Stenson, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). We find that former 49 U.S.C. Sec. 10729 and section 210(b) of the Staggers Act are clear upon their face, and that the specific use of the "revenue to variable cost" test in other sections of the Staggers Act implies its exclusion in the provisions at issue. We do not find it necessary to discuss in great detail the legislative history of these provisions, but we note that there is simply no basis in that history for the Commission's interpretation in AEPCO V.[7]
 
 
 50
 Rather than explaining its reference to legislative history in AEPCO V, the ICC argues in its brief that the "Commission's interpretation of the statutes it administers must be upheld if it is a permissible one" (Respondent's Br. at 18). The Commission's interpretation in this case is not supported by the language or the history of the statutes. The interpretation is not a permissible one. "Agency deference has not come so far that we will uphold regulations whenever it is possible to 'conceive a basis' for administrative action." Bowen v. American Hospital Association, --- U.S. ----, 106 S.Ct. 2101, 2112, 90 L.Ed.2d 584 (1986).
 
 
 51
 The ICC had no statutory basis to refuse to make the review AEPCO requests.
 
 CONCLUSION
 
 52
 The ICC has broad discretionary powers, and the scope of review of an ICC rate decision is narrow. Yet the discretion of the Commission must be exercised within prescribed parameters. In AEPCO IV and AEPCO V the ICC abused its discretion by (1) failing to abide by representations made before this court in 1983; (2) disregarding prior ICC decisions without an adequate explanation of reasons; and (3) relying on a mistaken interpretation of the applicable statutes.
 
 
 53
 The decision of the Commission in AEPCO V is VACATED, except to the extent that it establishes a procedural schedule. The case is REMANDED to the ICC with specific instructions that the Commission review AEPCO's rate increases from November 28, 1977 through November 28, 1982 under the general Coal Rate Guidelines.
 
 
 54
 Because of the history of recalcitrance displayed by the ICC in this proceeding, this court will retain jurisdiction pending entry by the Commission of an order declaring that it will review AEPCO's rate increases from November 28, 1977 through November 28, 1982 under the general Coal Rate Guidelines. The ICC shall file with this court, no later than sixty days from the filing of our mandate, a copy of such order.
 
 
 55
 Any future appeals with respect to this matter shall be directed to this panel.
 
 
 
 *
 Honorable Alicemarie H. Stotler, United States District Judge, Central District of California, sitting by designation
 
 
 [1]
 During the years in question, AEPCO coal moved over 371 miles of Santa Fe rail lines from Gallup to Deming, New Mexico, and then over 152 miles of Southern Pacific rail from Deming to Cochise, Arizona
 
 
 [2]
 The language of section 10729 was added to the Interstate Commerce Act in 1976 by section 206(a) of the Railroad Revitalization and Regulatory Reform Act, Pub.L. No. 94-210, Sec. 206, 90 Stat. 41. That section was renumbered and recodified, without substantive change, by Act of Oct. 17, 1978, Pub.L. No. 95-473, 92 Stat. 1389. Rail rates were eligible for protection under section 10729 if an investment of at least one million dollars was required to implement the rate. 49 U.S.C. Sec. 10729(a)
 The section read in full:
 Sec. 10729. Rail carriers; incentive for capital investment.
 (a) A proposed rate, classification, rule, or practice for transportation by a rail carrier subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title requiring a total capital investment of at least $1,000,000 to implement shall be established and become effective under this section. This section applies whether the investment is made individually or collectively by the carrier or by a shipper, receiver, or agent for any of them, or by a third party.
 (b) A rail carrier may file a notice of intent to establish a rate, classification, rule, or practice under subsection (a) of this section with the Commission. The notice must include a sworn affidavit detailing the anticipated capital investment. Unless the Commission after holding a proceeding under subsection (c) of this section, decides by the 180th day after the notice is filed that the proposed rate, classification, rule, or practice would violate this subtitle, the carrier may establish that rate, classification, rule, or practice at any time during the next 180 days, and it may become effective 30 days after it is established. Once a rate, classification, rule, or practice becomes effective under this section, the Commission may not, for 5 years, suspend or set it aside as violating section 10701, 10726, 10741-10744, or 11103 of this title. However, the Commission may order the rate, classification, rule, or practice to be revised to a level equal to the variable costs of providing the transportation when the Commission finds the level then in effect reduces the going concern value of the carrier.
 (c) On request of an interested person, the Commission shall hold a proceeding to investigate and determine whether the rate, classification, rule, or practice proposed to be established under this section complies with this subtitle. The Commission must give reasonable notice to interested parties before beginning a proceeding under this subsection but may act without allowing an interested party to file an answer or other formal pleading. Pub.L. 95-473, Oct. 17, 1978, 92 Stat. 1389.
 
 
 [3]
 Staggers Rail Act of 1980, Pub.L. No. 94-448, Sec. 210, 94 Stat. 1910-11:
 Phaseout of Capital Incentive Rates. Sec. 210.
 (a) Section 10729 of title 49, United States Code, and the item relating to such section in the section analysis of chapter 107 of such title, are repealed.
 (b) Notwithstanding any other provision of law, any rate established by a rail carrier under section 10729 of title 49, United States Code, prior to the effective date of this Act shall remain in effect in accordance with its terms, but for no longer than 5 years after the date it became effective, unless the parties otherwise agree. However, the Interstate Commerce Commission may, during the period such a rate is in effect, order such rate revised to a level equal to the incremental cost of providing the transportation if the Commission finds that the level then in effect reduces the going concern value of the rail carrier.
 
 
 [4]
 The ICC adopted the final version of its general Coal Rate Guidelines on September 3, 1985, after nearly seven years of public comment and agency deliberation. Ex Parte No. 347 (Sub. No. 1), Coal Rate Guidelines, Nationwide, 1 I.C.C.2d 520 (1985). The final Guidelines apply a coal rate standard called "Constrained Market Pricing," which is intended "to assure that captive shippers will not be required to pay more than is necessary for the carrier to earn adequate revenues, or to pay more than is necessary for efficient service." Consolidated Rail Corp. v. United States, 812 F.2d 1444, 1450 (3d Cir.1987) (upholding the validity of the Guidelines). The Guidelines are to be applied to determine the reasonableness of all coal rail rates in non-competitive markets
 
 
 [5]
 "We conclude that the protection of section 210(b) of the Staggers Act extends only to the capital incentive rate approved specifically under former section 10729 and not to the rate as subsequently increased by general rate and fuel cost increases established under 49 U.S.C. 10707. To the extent such increased rate exceeds cost recovery increases, it is subject to challenge." AEPCO IV at 6. The Commission did not explain how it resolved the contradiction between these two sentences
 
 
 [6]
 The legislative history referred to by the Commission reads in full: "The House amendment repeals the capital-incentive rate provision, but preserves all capital-incentive rates from challenge as unreasonable or discriminatory if filed prior to the effective date of this Act, subject to the 5-year limitation from the date the rate became effective, unless the parties otherwise agree. The Commission may, during the period the rate is in effect, order the rate revised to a level equal to the incremental cost of providing the transportation, if the Commission finds that the rate level in effect reduces the going concern value of the rail carrier." H.R. No. 96-1430, 96th Cong., 2d Sess 101 (1980). AEPCO does not contest the ICC's authority to approve rate increases, it simply challenges the Commission's refusal to review the reasonableness of such increases under the principles of the general Coal Rate Guidelines
 
 
 [7]
 The only reference to legislative history offered by the Commission in AEPCO IV or AEPCO V is reprinted in full at note 6, supra, and it does not support the Commission's expansive interpretation. Contrary to the Commission's representation to this panel, a further examination of the legislative history of section 210 of the Staggers Act reflects a clear intent by Congress to limit, rather than expand, the rate protection established by section 10729. See, e.g., Railroad Coal Rates and Public Participation: Oversight of ICC Decisionmaking, Report Together With Separate Views By the Subcomm. on Oversight and Investigations of the Comm. on Interstate and Foreign Commerce (Comm. Print 96-IFC 40), 96th Cong., 2d Sess. 8 (1980), in which the Subcommittee assigned to review the effect of section 10729 recommended its repeal and a reassessment of the four capital incentive rates already in existence. The full Committee agreed that repeal was appropriate because of the extensive litigation and regulatory complexity the provision had spawned, but the Committee stopped short of requiring the ICC to reexamine the existing rates. See Rail Act of 1980, Report Together With Separate and Additional Views of the Comm. on Interstate and Foreign Commerce, H.Rep. No. 96-1035, 96th Cong., 2d Sess. 59 (1980). There is nothing in the legislative history of 49 U.S.C. Sec. 10729 or section 210 of the Staggers Act to indicate congressional intent to expand the rate protection offered by section 10729 to subsequent rate increases